2001-NMSC-016

22 P.3d 666

**Ron LYTLE, Warden of the Southern New Mexico Correctional Facility, Appellant,**

v.

**Lloyd Keith JORDAN, Appellee.**

No. 25,786.

Supreme Court of New Mexico.

March 26, 2001.

Patricia A. Madrid, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, NM, for Appellant.

Jacquelyn Robins, Albuquerque, NM, for Appellee.

Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Enfield, L.L.P., Brian Anthony Pori, Albuquerque, NM, for Amicus Curiae New Mexico Criminal Defense Lawyers Association.

## OPINION

SERNA, Chief Justice.

{1} The State appeals from the district court's grant of Defendant Lloyd Keith Jordan's petition for writ of habeas corpus on the ground of ineffective assistance of counsel. *See* Rule 12–102(A)(3) NMRA 2001 (appeal from the granting of writs of habeas corpus taken to the Supreme Court). Jordan was convicted in 1991 of two counts of criminal sexual penetration in the first degree and four counts of criminal sexual contact of a minor in the third degree. Jordan's convictions were affirmed on direct appeal by the Court of Appeals, *State v. Jordan*, 116 N.M. 76, 860 P.2d 206 (Ct.App.1993), and this Court subsequently denied his petition for writ of certiorari to the Court of Appeals, *State v. Jordan*, 115 N.M. 795, 858 P.2d 1274 (1993). Following an evidentiary hearing, the district court found that trial counsel had rendered ineffective assistance of counsel and issued the writ of habeas corpus. We reverse the district court.

## I. Facts and Background

{2} Two members of the Public Defender's office, Jeff Rein and Ralph Odenwald, represented Jordan at trial. The State charged Jordan with two counts of criminal sexual penetration in the first degree and six counts of criminal sexual penetration of a minor in the third degree. Based on pretrial motions, the trial court prohibited Jordan from introducing testimony by the victim's mother that the victim had previously accused her father of sexual abuse. The trial court allowed the defense to introduce evidence of the victim's dysfunctional family situation and allowed the prosecution to introduce evidence that Jordan had previously fondled the victim and had also previously exposed himself to the victim from his window. The trial court admitted a statement describing the juvenile adjudication of a prior incident of sexual assault by a juvenile against the victim, but did not allow specific evidence of the incident.

### A. The State's Evidence at Trial

{3} At Jordan's trial, the State presented the testimony of the victim, who was twelve years old at the time of trial and ten years old at the time of the incident. The victim testified that she and her family lived next door to Jordan and that she, her brother, and her mother lived with Jordan for three days in July of 1989 because her parents had a fight. On the second night of staying with Jordan, while her mother was showering, the victim went into a bedroom with her brother and Jordan, where they told ghost stories. She testified that Jordan told a story about a Mexican man picking up a naked woman, taking her home, and getting on top of her. Jordan suggested to the victim that they act out the ghost story, with him playing the man and her playing the woman. The victim told Jordan that she did not want to do it, but Jordan insisted and started touching her.

{4} The victim testified that Jordan put his finger and tongue inside her vagina, touched her breasts and buttocks with his hands, and rubbed his penis on her vagina and her stomach. The victim also testified that Jordan ejaculated. According to the victim, her brother jumped on Jordan's back while Jordan was touching her, but Jordan threw him off. Jordan stopped touching the victim once her mother finished her shower. Jordan told the victim not to tell anyone what had happened or they would think she "was a bad girl." The victim did not tell her mother what had happened that night, but she told her father when he came to Jordan's trailer the next morning. After the victim's father called the police and the victim made a statement, the victim and her brother were taken to a foster home and lived apart from their parents for approximately a year and a half. The victim testified that on a previous occasion Jordan put his hand under her bathing suit in a swimming pool and that Jordan had repeatedly exposed himself to her while he was standing at a window in his trailer across from the victim's bedroom window.

{5} The State also introduced the testimony of the victim's brother, who was eight years old at the time of the incident and ten years old at the time of trial. The victim's brother testified that he saw Jordan touch the victim's "private" with his "private." The victim's brother also testified that he jumped on Jordan's back to stop him from hurting his sister.

{6} The victim's father also testified at trial. He stated that about a year before the incident with which Jordan was charged, the victim told him and her mother about the incident in the swimming pool and about Jordan exposing himself to her through his window. The victim's father testified that he shaded her window to prevent her from being able to see Jordan. He also stated that he told her to stay away from Jordan and not to go swimming with him in the pool. The victim's father testified that, against his wishes, the victim's mother cleaned Jordan's house. He testified that he had an argument with the victim's mother about this situation and that she took the children to Jordan's house. The victim's father was concerned for the children due to the prior incidents and called the police on the first night of their stay with Jordan, before the event at issue in the present case, to express concern for his children's safety. The police came to Jordan's trailer and talked to the victim's mother and the children. According to the victim's father, he went over to Jordan's trailer in the morning two days later and, because of the prior incidents, asked the victim if anything had happened. The victim described to her father Jordan's sexual conduct toward her while her mother was in the shower.

{7} The State also introduced the testimony of three expert witnesses. The trial court accepted Dr. Geoffrey Sutton as an expert in clinical psychology with a subspecialty of children. Dr. Sutton performed a psychological screening on the victim and her brother for the Department of Human Services shortly after the incident at Jordan's trailer. Dr. Sutton testified that the victim's use of certain terms, such as "middle" instead of vagina, indicated that her description of the incident was that of a child rather than an adult. Dr. Sutton testified that there were several other aspects of the victim's account of the incident that indicated that it was both reliable and valid, including her ability, despite living in a dysfunctional family, to distinguish fact from fantasy, her consistency in telling different individuals what had occurred, the fact that she had an average long-term memory and an above-average short-term memory, and her strong emotion

about the incident two years after it occurred. Dr. Sutton opined that the victim had not been coached with respect to the incident involving Jordan, and he testified that, due to the amount of anger and emotion still present in her two years after the event, it was unlikely that she could have fabricated the story.

{8} The State also introduced the testimony of Dr. Carol Geil, whom the trial court accepted as an expert in pediatric medicine and child sexual abuse. Dr. Geil testified that she performed a physical examination of the victim the day after the incident with Jordan. For purposes of treatment, the victim told Dr. Geil a version of the incident similar to one related during her testimony. The victim then demonstrated to Dr. Geil where Jordan had touched her by using anatomically correct dolls provided by Dr. Geil. During the physical examination, Dr. Geil found generalized redness of the victim's entire vaginal area and also discovered a small hair in her vulvar area.

{9} The State introduced the testimony of Detective Dave Laycock of the Albuquerque Police Department. Detective Laycock had worked in the criminalistics laboratory with APD for approximately sixteen years. Detective Laycock completed the FBI school in hair comparison in 1977 and attended a symposium on hair comparison in 1985. He indicated that he had completed approximately seventy hair comparison cases and that he had testified in court as an expert in hair comparison in several criminal cases. The trial court accepted Detective Laycock as an expert in hair comparison without objection from the defense. Detective Laycock testified that hair comparisons are not as definitive as fingerprint analyses. With hair comparisons, an expert could use the results to eliminate individuals as the source of a hair or to say that the hair is consistent with an individual, but the results could not conclusively show that a particular individual was the source of the hair. Detective Laycock testified that after an initial visual inspection of the hair found on the victim he believed that because the hair was only a fragment it was of questionable value for purposes of hair comparison. At the prosecutor's re-

quest, however, Detective Laycock performed a comparison between the hair found on the victim and a number of reference hairs from Jordan. Detective Laycock testified that he found a number of similarities between the hair found on the victim and Jordan's pubic hair. He testified that because the hair found on the victim was only a fragment he could not compare the root of the hair. Based on other similarities between the hairs, however, Detective Laycock testified that Jordan "could not be excluded as a potential source of the hair fragment."

### B. Defense Counsel's Trial Strategy

{10} Defense counsel's strategy at trial was to argue that the victim fabricated her story of sexual abuse by Jordan in an attempt to reunite her feuding parents. Defense counsel also insinuated that the victim's father encouraged her to lie because he disliked Jordan. Alternatively, defense counsel suggested that the victim's father inadvertently influenced her by the questions he asked her.

{11} Defense counsel established through numerous witnesses that the victim lived in a dysfunctional family. On cross-examination of the victim, defense counsel questioned her about her parents' relationship. Defense counsel established that her parents frequently fought and that her mom would often leave, sometimes taking the children with her. On cross-examination, the victim testified that she was scared when her parents fought because they would throw things and had threatened to kill each other. She also testified that the argument which prompted her mother to live with Jordan was caused by her father accusing her mother of having an affair with Jordan. Additionally, the victim testified that she was very surprised that she was taken to a foster home after the incident because she had been expecting to live with her parents.

{12} Defense counsel sought to impeach the victim's brother's testimony by attacking his ability to remember the incident. On cross-examination, the victim's brother testified that it was dark in the room because the lights were off and that he "couldn't see that much" and "[c]ouldn't really see any-

thing." Defense counsel also established on cross-examination that the victim's brother did not remember the incident very well. On redirect, however, the victim's brother maintained his initial version of events. The victim's brother also testified on cross-examination that his parents frequently fought and his mom would leave home on occasion. The victim testified that her brother was laughing when he jumped on Jordan's back, contrary to the victim's brother's testimony that he was trying to stop Jordan from hurting the victim. Defense counsel, following up on the victim's impression of her brother's actions, asked her brother, "Did you think maybe they were still wrestling around?" The victim's brother responded, "I can't remember."

{13} On cross-examination, the victim's father confirmed that the argument causing the victim's mother to go to Jordan's trailer with the children was caused by his jealousy over his wife's relationship with Jordan. Defense counsel also called the victim's mother to testify. The victim's mother stated that she was frequently physically abused by her husband and that the children had witnessed some of the beatings. The victim's mother testified that her husband also beat the children and that the victim was afraid of him. With respect to the argument that precipitated her staying at Jordan's trailer with the children, the victim's mother explained that, after accusing her of having an affair with Jordan, her husband beat her in front of the children to the point that she almost lost consciousness. The victim begged her father to stop hurting her mother.

{14} Additionally, the victim's father testified that when the victim told him about the incident he "started to go into details or asking [her] what did happen, did this happen or did this happen." Defense counsel then asked, "So as this conversation went on, you would say, 'Well, did he do this or did he try to do that' or things of that nature, is that right?" The victim's father responded, "Yes, not thinking that she might understand or know anything about it. I just asked." Detective Marvin Solsrud, one of the State's witnesses, testified on cross-examination that children are highly susceptible to suggestion

and that "[t]hey will often say what they think you want them to say." Defense counsel argued during closing that the victim made up the story in response to her father's leading questions and highlighted Detective Solsrud's testimony as support.

{15} Defense counsel also buttressed his defense theory by highlighting a number of inconsistencies in the versions of the incident told by the victim to numerous people. For example, Detective Solsrud testified that he interviewed the victim and her brother after the incident. The victim did not tell him about Jordan ejaculating, and her brother told him that he did not see either the victim or Jordan undressed. Also, the victim testified that Jordan exposed himself to her after the incident with which Jordan was charged and that the victim told her father about it. However, several witnesses, including the victim's mother and father and Dr. Sutton, testified that the victim never mentioned seeing Jordan expose himself after the incident in his trailer. In highlighting one of these inconsistencies during closing, defense counsel argued, "So did she lie or did she forget? If she forgot, what else did she forget about? If she lied, what else did she lie about?"

{16} Defense counsel also attacked the testimony of the State's expert witnesses. With respect to Dr. Geil's testimony, defense counsel elicited on cross-examination that the redness observed in the victim's vaginal area could have been caused by something other than sexual abuse. Additionally, defense counsel questioned Dr. Geil about her teaching techniques and pointed out that the expert did not follow one of her own guidelines, which is to observe a patient over a period of time in order to determine whether findings such as redness are abnormal for the patient or merely part of the patient's normal anatomy. During closing, defense counsel highlighted the fact that Dr. Geil examined the victim only once and that the failure to track observations over time was contrary to Dr. Geil's own instructions to students. Defense counsel also suggested during closing that Dr. Geil's testimony was undermined by the fact that the State failed to introduce results from the samples taken from the victim to detect semen. Finally, defense counsel pointed out that Dr. Geil did not investigate the victim's story but took her account at face value. Defense counsel suggested that Dr. Geil would say whatever was necessary to get a conviction.

{17} With respect to Detective Laycock and his hair analysis, defense counsel on cross-examination highlighted the problem with the sample consisting of only a hair fragment. In response, Detective Laycock testified, "The problem with the fragment is it's always possible that it did, in fact, come from somebody else and if you had the rest of the hair you would pick up those differences." Defense counsel also minimized the effect of the hair comparison by focusing on the equivocal nature of the results and by eliciting testimony that Detective Laycock did not compare the hair to samples from the victim's parents or from Jordan's daughters. During closing, defense counsel emphasized the inconclusiveness of the hair comparison and the lack of suitability of the hair for examination. Defense counsel also argued that the hair could have come from any number of people, including the victim's mother, who slept in the same bed as the victim at Jordan's trailer, or Jordan's daughters, who stayed with Jordan one week prior to the incident and slept in the same bed later occupied by the victim. Defense counsel concluded that "[w]e have no idea how [the hair] got there and no idea [whose] hair it is."

{18} With respect to Dr. Sutton, defense counsel established that Dr. Sutton did not serve as an investigator in the victim's case and he was "not in a position to look back and discover what happened." Dr. Sutton's purpose in evaluating the victim was only to determine her treatment needs. In addition, defense counsel established that Dr. Sutton's testimony concerning the use of child-like terms was based merely on his opinion and the guidelines of a text rather than on actual studies of abused children. Dr. Sutton also conceded to defense counsel that he questioned whether any abuse had occurred in the swimming pool "because she herself didn't interpret it clearly as abuse versus a bump." Defense counsel also attacked Dr. Sutton for not distinguishing between pres-

ent and past events, both the sexual abuse from the juvenile and the victim's removal from her parents' home for two years beginning in 1984, in assessing the results of the psychological tests on the victim. Defense counsel further attacked Dr. Sutton's conclusion that the victim's story was reliable and valid due to consistency over time. Defense counsel pointed to a number of inconsistencies in her account and established that Dr. Sutton made a "judgment call about what were the essential details" to reach the conclusion of consistency. Lastly, defense counsel elicited from Dr. Sutton that one of the most important things in the victim's life is her relationship with her parents, that children normally have some sort of reaction to problems in a parental relationship, and that the victim "does try to be a pleasing child."

{19} Finally, Jordan testified at trial. Jordan stated that he did go into the bedroom with the children and that they did tell ghost stories. However, Jordan testified that the victim, not him, told the story about the naked woman and that he left the room shortly after she told the story. Jordan testified that he did not touch the victim in any sexual manner. Defense counsel attempted to support Jordan's testimony through the cross-examination of other witnesses. For example, the victim testified that it was her and her brother's idea to go into the bedroom to tell ghost stories. The victim also testified that her brother liked to wrestle, that she and her brother were wrestling in the bedroom, and that they played "dog pile" on Jordan, during which Jordan threw them off onto the bed. Ultimately, defense counsel argued that the victim fabricated the story either to reunite her parents or because it was inadvertently suggested to her by her father.

## C. Evidence Introduced in the District Court on Collateral Review

{20} Jordan presented the testimony of four expert witnesses at the evidentiary hearing on his petition for writ of habeas corpus: Stephanie Smith, Dr. Mark Caplan, Dr. William Foote, and Nancy Hollander. Jordan did not introduce the testimony of either of his trial attorneys at the evidentiary hearing.

{21} The district court accepted Ms. Smith as an expert in hair comparison. According to Ms. Smith, defense counsel could have addressed a number of deficiencies in Detective Laycock's testimony if an expert had been consulted before the trial. First, Ms. Smith testified that Detective Laycock's qualifications could have been challenged. Additionally, Ms. Smith testified that Detective Laycock should not have been allowed to testify about the hair because it was only a small fragment and not suitable for comparison purposes. Finally, Ms. Smith testified that Detective Laycock should have compared the hair to other possible contributors, such as the victim's mother, and that defense counsel should have elicited other possible means of transfer.

{22} The district court accepted Dr. Caplan as an expert in psychology. Dr. Caplan testified that Jordan did not meet the criteria to support a diagnosis of pedophilia. According to Dr. Caplan, based on Dr. Sutton's evaluation, the victim's father met a number of factors indicating pedophilia.

{23} The district court accepted Dr. Foote as an expert in psychology with a specialty in forensic psychology. Dr. Foote, had he been retained prior to trial, would have advised defense counsel to question Dr. Geil about the possibility that the redness found in the victim's vaginal area was caused by masturbation, and he would have advised defense counsel to investigate the issue. Dr. Foote also would have advised defense counsel to obtain the records about an allegation of sexual abuse of the victim by her father in 1984 because of the possibility that the victim substituted an allegation against Jordan in place of her parent. Additionally, Dr. Foote would have advised defense counsel to obtain the records of the sexual assault on her by the juvenile in 1989 to determine if the victim became familiar with sexual terms as a result of prior incidents of abuse. Dr. Foote also testified that there were a number of deficiencies in Dr. Sutton's testimony. First, he did not do a complete evaluation to determine whether abuse had occurred. Second, as an evaluator, he may have been uncon-

sciously biased to find abuse in order to treat the victim in his capacity as a therapist. Third, he may have had a conflict of interest in serving as a therapist and an expert witness because a therapist does not question the facts underlying a psychological problem but instead seeks to alleviate the problem.

{24} The district court accepted Ms. Hollander as an expert in criminal defense with a specialty in ineffective assistance of counsel claims. She testified that defense counsel should have consulted with experts to work on pretrial motions, to assist in preparing for trial, and to testify at trial. Ms. Hollander stated that an expert could have assisted defense counsel in assessing the victim's claim, in determining whether more discovery was necessary, and in determining whether to conduct an independent examination of the victim. Ms. Hollander testified that defense counsel should have used experts to support several different pretrial motions, including a motion prohibiting Dr. Sutton from testifying as to the victim's credibility. Ms. Hollander would have used expert testimony to support defense counsel's theory that the victim fabricated her account in order to reunite her parents. Ms. Hollander testified that defense counsel's failure to consult experts fell below an objective standard of reasonableness and that there is a reasonable probability that but for defense counsel's deficient performance the result of the trial would have been different.

## II. Discussion

### A. Standard of Review

{25} The United States Supreme Court has described in detail the appropriate standard for an alleged violation of the right to effective assistance of counsel as protected by the Sixth and Fourteenth Amendments to the United States Constitution. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{26} With respect to the showing of deficiency in performance, the inquiry is whether defense "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. This inquiry must take into account all of the circumstances surrounding the defense. *See id.* at 690, 104 S.Ct. 2052; *State v. Taylor*, 107 N.M. 66, 72, 752 P.2d 781, 787 (1988) ("In considering an ineffectiveness claim, the entire proceeding must be reviewed as a whole."), *overruled on other grounds by Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989).

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citation omitted) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)); *see United States v. Blackwell*, 127 F.3d 947, 955 (10th Cir.1997). "A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct." *State v. Jacobs*, 2000-NMSC-026, ¶ 49, 129 N.M. 448, 10 P.3d 127.

{27} With respect to the showing that counsel's deficient performance prejudiced the defense, "[t]he defendant must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In the challenge of a conviction from a verdict, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052. A court reviewing for prejudice "must consider the totality of evidence presented." *Jacobs*, 2000–NMSC–026, ¶ 48, 129 N.M. 448, 10 P.3d 127.

■■ {28} On appeal from the grant of a writ of habeas corpus by the district court, "findings of fact of the trial court concerning the habeas petition are reviewed to determine if substantial evidence supports the court's findings. Questions of law or questions of mixed fact and law, however, including the assessment of effective assistance of counsel, are reviewed de novo." *Duncan v. Kerby*, 115 N.M. 344, 347–48, 851 P.2d 466, 469–70 (1993) (citation omitted). Although the district court labeled many of the determinations at issue in this case as "findings of fact," these findings are mixed questions of fact and law which we review de novo to the extent that they implicate the issues of exercising the skill of a reasonably competent attorney and whether the outcome of the trial would have been different absent unprofessional errors.

## B. Effectiveness of Jordan's Trial Counsel

{29} The district court concluded that defense counsel did not exercise the skill of a reasonably competent attorney and that there was a reasonable probability that without counsel's deficient performance the result of the trial would have been different. The district court based its conclusion of ineffective assistance on several grounds; we discuss each below.

### 1. Hair Expert

■ {30} The district court accepted the testimony of Jordan's expert, Ms. Smith, and found that Jordan's trial counsel could have attacked the qualifications and conclusions of Detective Laycock with respect to the hair examination. We believe this finding is unsupported by substantial evidence. In concluding that the hair comparison performed by Detective Laycock was flawed, Ms. Smith reviewed only the trial transcript of Detective Laycock's testimony. She did not examine the hair, and she did not compare Jordan's hair to that of other individuals, such as the victim's mother. She also did not review Detective Laycock's résumé or curriculum vitae.

{31} On the basis of the transcript, Ms. Smith gave her opinion that Detective Laycock was not qualified to testify as an expert in hair examination. Ms. Smith testified that Detective Laycock made no mention of his educational background, the individuals who oversaw his training, proficiencies he had been given, or tests he had successfully passed to prove his proficiency. Ms. Smith testified that "it is inappropriate to compare pubic hair fragments and that they should be deemed of no value for microscopic comparison purposes." Ms. Smith testified that because Detective Laycock performed approximately seventy hair examinations since 1977, which averaged to about five cases per year, he could not "maintain any level of competency without having viewed a vast number of hairs."

{32} We believe that this testimony is based on speculation. *See Marjon v. Quintana*, 82 N.M. 496, 497, 484 P.2d 338, 339 (1971) ("[T]o be substantial, it must be such relative evidence as a reasonable mind is willing to accept as adequate support for a conclusion, and it must amount to more than mere speculation or conjecture." (citations omitted)); *Baca v. Bueno Foods*, 108 N.M. 98, 102, 766 P.2d 1332, 1336 (Ct.App.1988) ("Evidence from which a proposition can be derived only by speculation among equally plausible alternatives is not substantial evidence of the proposition."). Although Detective Laycock testified that he performed approximately seventy hair examinations since 1977, he did not testify how many he had performed in recent years or months. It is speculative simply to average the number of

cases by the number of years of employment. Further, it is conjecture to say that Detective Laycock was not qualified to testify as an expert when the witness had not reviewed his qualifications beyond the testimony at trial. Jordan did not object to Detective Laycock's qualifications at the trial, and he thus prevented the State from having the opportunity to introduce more detail about Detective Laycock's training, education, and experience. Considering that Detective Laycock had testified as an expert in hair analysis in a dozen criminal cases, defense counsel may reasonably have concluded that a challenge of his qualifications would have been unsuccessful. Ms. Smith's review of the transcript does not by itself establish that Detective Laycock was not qualified to testify as an expert. Thus, the district court's findings concerning Detective Laycock's qualifications are not supported by substantial evidence.

{33} Other aspects of Ms. Smith's testimony are similarly troublesome. For example, Ms. Smith testified that the hair could have come from the victim because, "[i]f the child is starting to go through puberty, the child may have started to develop hairs around the rectum, [which] often precede hairs on the pubic area." This testimony directly conflicts with the trial testimony of Dr. Geil, who examined the victim and testified that she was prepubescent and had no pubic hair. Jordan did not challenge Dr. Geil's testimony on this subject. Ms. Smith's inaccurate testimony is likely the product of the limited material Jordan provided to her to form an opinion. Additionally, although Ms. Smith did not examine the hair, she still speculated that, "not looking at the fragment, it may have even been difficult to exclude any Caucasian person as a contributor of that hair."

{34} In any event, although defense counsel might have marginally diminished the weight of Detective Laycock's testimony by cross-examining him on his methodology and conclusions in accordance with Ms. Smith's testimony, Jordan was not prejudiced by defense counsel's failure to consult an expert concerning the hair comparison. Even on direct examination, Detective Laycock admitted that his examination of the hair was of limited relevance. Detective Laycock further testified on cross-examination that the missing parts of the hair could have resulted in the exclusion of Jordan. This testimony substantially conforms to the testimony of Ms. Smith that "[t]here may have been something present in the other portion of the hair that would have . . . caused him to say that it was dissimilar from the standard of [Defendant]." Further, similar to Ms. Smith's testimony, defense counsel elicited on cross-examination that Detective Laycock did not compare the hair to anyone else, such as the victim's family members, and suggested in closing that the hair could have come from the victim's mother or Jordan's daughters because they had all slept, at various times, in the same bed at the trailer. Thus, defense counsel adequately cross-examined Detective Laycock on the issue of hair comparison, and there is no reasonable probability that consultation with experts would have affected the outcome of the trial. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 (providing that the prejudice prong of a claim of ineffective assistance "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable").

### 2. Profiling

■ {35} The district court found that "[a] psychological evaluation of [Jordan] would have been of use for the defense: the defense could have presented the personality assessment." We are not persuaded, however, that this evidence would have been admissible at Jordan's trial. Profile evidence relating to pedophilia offered by a defendant has been excluded in a number of jurisdictions on various grounds, including a lack of relevance, *see State v. Floray,* 715 A.2d 855, 859 (Del.Super.Ct.1997) (reviewing cases), *aff'd on other grounds,* 720 A.2d 1132, 1134 & n. 1 (Del.1998), unfair prejudice substantially outweighing probative value, *see, e.g., id.* at 858–59, and a lack of reliability or general acceptance of the scientific knowledge, *see id.* at 858 n. 8 (listing cases); *Flanagan v. State,* 625 So.2d 827, 828 (Fla.1993); *see also Duncan v. State,* 232 Ga.App. 157, 500 S.E.2d 603, 608 (1998) (concluding that the evidence invades the province of the jury). Dr. Caplan

testified that the psychological profile could not assist in determining whether Jordan committed the sexual abuse charged in his case. Additionally, the profile could not determine whether an individual had or would sexually abuse a child. In fact, when asked if the evaluation could reveal whether a particular individual is a perpetrator, Dr. Caplan responded, "[A]bsolutely not."

{36} Had this evidence been offered during Jordan's trial, the court might reasonably have concluded that Dr. Caplan's profile would not have made the existence of a fact of consequence more probable or less probable than without the evidence, *see* Rule 11–401 NMRA 2001 (defining relevant evidence), that the profile would have been of such minimal probative value that it would be inadmissible under Rule 11–403 NMRA 2001 (providing that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury"), or that the expert testimony did not comport with the requirements of Rule 11–702 NMRA 2001. In light of the treatment of this issue by other jurisdictions, Jordan's defense counsel might have decided as a matter of strategy that a profile would not have been of significant enough value to warrant an attempt to overcome these evidentiary hurtles. *Cf. Jacobs,* 2000–NMSC–026, ¶ 49, 129 N.M. 448, 10 P.3d 127 ("As a matter of strategy, counsel may have decided not to advance once again a challenge that has never been sustained by this Court."). *See generally Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (mentioning "the wide latitude counsel must have in making tactical decisions"). In any case, based on Dr. Caplan's testimony about the limited value of this evidence, Jordan has failed to demonstrate that his counsel's failure to obtain this type of evidence, even if admissible, rendered the result of the trial unreliable.

{37} Jordan, quoting the Court of Appeals' opinion on direct appeal, argues that the profile evidence was necessary and relevant "because the State was allowed to present evidence as to '[Jordan's] lewd and lascivious disposition toward the victim.'" Jordan, however, overlooks that this language in the Court of Appeals' opinion served as an alternate appellate holding. The Court of Appeals was evaluating the trial court's decision to admit the father's testimony that the victim and her brother told him that Jordan was exposing himself at his window and that the victim told him that Jordan touched her in the swimming pool. *Jordan,* 116 N.M. at 81, 860 P.2d at 211. The trial court had allowed the testimony in order to explain why the victim's father asked her if anything had happened and to explain his concern for the children while they were at Jordan's trailer. The Court of Appeals held that the trial court did not abuse its discretion in determining that the prejudicial effect of the evidence did not substantially outweigh its probative value. *Id.* ("[T]he trial court might have concluded that the jury needed to be told the context in which the victim and her father claimed he solicited her account in order to evaluate the likelihood that he had or had not encouraged a false accusation."). The Court of Appeals further "note[d]" that the evidence could be "probative of [Jordan's] lewd and lascivious disposition toward the victim. This rationale additionally supports the trial court's exercise of discretion." *Id.* (citation omitted). As can be seen from this discussion, the trial court did not rely on the alternative ground mentioned by the Court of Appeals in admitting the evidence. In fact, the trial court excluded testimony from the victim's mother that she herself had seen Jordan expose himself in his window. Had Jordan presented a psychological profile, the State may have been allowed to introduce this evidence in rebuttal. *See* Rule 11–405(A) NMRA 2001 ("On cross-examination [of a witness giving an opinion as to a trait of character], inquiry is allowable into relevant specific instances of conduct."). Considering that Jordan denied exposing himself to the victim on prior occasions, defense counsel may have reasonably concluded as a matter of strategy that the additional evidence of Jordan's prior acts would likely be far more damaging to the defense than the absence of a psychological profile. *See State v. Hester,* 1999–NMSC–020, ¶ 11, 127 N.M. 218, 979 P.2d 729 ("It is not the role of this Court on appeal to second guess trial tactics.").

### 3. Expert Assistance in the Cross Examination of Dr. Geil and Dr. Sutton

{38} The district court found that there were a number of issues that arose during the trial that required expert assistance for proper cross-examination. First, Dr. Foote testified that defense counsel should have asked Dr. Geil about the possibility of masturbation in causing the redness in the victim's vaginal area. Dr. Foote testified that children who have been previously abused tend to masturbate more often. However, Dr. Foote conceded that defense counsel proceeded on the theory that the prior instances of sexual abuse did not occur and that the victim had fabricated those incidents in the same way that she fabricated the story about Defendant. This appears to be a rational trial strategy taken by the defense and is not to be questioned in hindsight merely because it was unsuccessful. Given defense counsel's tactical position that no abuse occurred, Dr. Foote's opinions on this subject would not have been useful to the defense.

{39} In any case, defense counsel elicited from Dr. Geil that the redness could have had any number of causes. Additionally, defense counsel suggested that the redness may just be a part of the victim's anatomy and that Dr. Geil's failure to follow the redness over time was contrary to her own teachings. Jordan has failed to overcome the strong presumption of effective assistance and has also failed to demonstrate any prejudice from the failure to consult an expert witness for this cross-examination.

{40} Second, the district court found that an expert would have advised defense counsel to obtain the reports of earlier abuse, which could have suggested two things: (1) the victim's father might have abused her around the time that she stayed at Jordan's trailer and she may have placed blame on Jordan out of loyalty to her father; and (2) the victim may have had prior exposure to information about sex, showing that she had the ability to fabricate the story. Jordan has failed to show that these omissions are not attributable to a reasonable trial strategy. The victim's father did not have access to the victim for at least two days before the incident, and Dr. Geil testified that redness typically dissipates within seventy-two hours. Defense counsel could reasonably, as a matter of strategy, conclude that it was better to argue that the event never occurred than to argue that someone else abused the victim based on the evidence intended to be offered by the State. "[C]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 (emphasis added). Additionally, it appears that defense counsel was aware of the details of the juvenile's abuse of the victim, but the trial court excluded all information about the incident other than the fact of conviction. Thus, defense counsel may not have even had the opportunity to argue prior knowledge of particular sexual information, such as ejaculation. *Cf. State v. Martinez,* 1996–NMCA–109, ¶ 27, 122 N.M. 476, 927 P.2d 31 (holding that "[f]ailure to renew at trial a motion concerning an evidentiary matter which has been denied in limine does not constitute ineffective assistance of counsel").

{41} Based on investigation, defense counsel proceeded on the assumption that the prior allegations of abuse were false, consistent with defense counsel's strategy that the victim's allegation in the present case was false. Thus, it appears from the record that defense counsel diligently investigated this case and chose a reasonable strategy based on the investigation. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). We conclude Jordan has failed to overcome the strong presumption of effective assistance with respect to the failure to obtain the reports of earlier abuse.

{42} Third, the district court found that an expert could have guided defense counsel in cross-examining Dr. Sutton about crossing the line between evaluator, therapist, and expert, and about the possibility of bias from his confusion of roles. However, Dr. Sutton testified on cross-examination that he did not conduct an investigation of the victim's claims. He also testified that he did not evaluate the victim with a predisposed notion that she had been abused and that he often evaluates children for the Department of Human Services who do not need further therapy. Thus, Jordan has failed to show how Dr. Foote's testimony about a conflict between the role of evaluator and therapist would have benefitted the defense. In any event, we do not believe that Dr. Foote's testimony so undermines Dr. Sutton's credibility that it would have created a reasonable probability of a different result in the trial, which is essential to a showing of prejudice.

{43} With respect to Dr. Sutton's testimony about the validity of the victim's story, thereby reinforcing the victim's credibility, defense counsel was clearly aware of this issue. In fact, defense counsel had successfully argued to the trial court that Dr. Sutton should not be allowed to testify about the victim's credibility. Defense counsel may have decided during trial, however, that Dr. Sutton's testimony about validity based on consistency would be helpful to the defense. As a primary avenue of defense, defense counsel argued that the inconsistencies in the victim's story to the various people she told rendered it unworthy of belief. Defense counsel may have believed that attacking Dr. Sutton on this issue on cross-examination would lend support to this defense theory and undermine the credibility of Dr. Sutton and the victim. Jordan has therefore failed to demonstrate that defense counsel's actions are not attributable to a rational trial strategy. "On appeal, we will not second guess the trial strategy and tactics of the defense coun-

sel." *State v. Gonzales,* 113 N.M. 221, 230, 824 P.2d 1023, 1032 (1992).[1]

## 4. Failure to Present Expert Testimony to Rebut the State's Expert Testimony

{44} The district court found that defense counsel was required to utilize expert testimony regarding a number of different issues in this case even though the issues could be reached through cross-examination. We note initially that this finding represents a mixed question of fact and law because it establishes a per se rule requiring expert testimony in order to meet an objective standard of reasonableness. We reject this determination because it is in direct conflict with case law in this State and with the standard established in *Strickland,* both of which leave such matters to the sound professional judgment of defense counsel absent a showing of unreasonableness. Indeed, this Court has expressly rejected the contention that the failure to introduce the testimony of an expert witness constitutes ineffective assistance of counsel per se. "We will not substitute our own judgment over trial tactics for the judgment of defense counsel when it is not clear that the defendant was deprived of a meritorious defense because the judgment of defense counsel was without excuse or justification." *State v. Vigil,* 110 N.M. 254, 258, 794 P.2d 728, 732 (1990); *accord State v. Chamberlain,* 112 N.M. 723, 734, 819 P.2d 673, 684 (1991).

{45} In *Chamberlain,* this Court noted that "[t]he ballistics evidence put on by the prosecution was imprecise and subject to vigorous cross-examination. The defense counsel made a tactical decision to limit the amount and specificity of evidence in this area." 112 N.M. at 734, 819 P.2d at 684. As a result, the Court concluded that the defendant was *not deprived of a defense* because of his trial counsel's strategy. *Id.*

{46} With respect to Jordan's argument that defense counsel should have hired an

---

1. Dr. Foote testified that anatomically correct dolls are disfavored in scientific literature and, if used inappropriately, might contribute to a false report. The district court found that defense counsel's failure to consult an expert concerning Dr. Geil's use of anatomically correct dolls was deficient. Although the State challenged the dis-

trict court's finding, Jordan failed to argue this issue in his answer brief. In any event, we believe the finding is erroneous. Dr. Foote testified that Dr. Geil's use of the dolls was not inappropriate. Therefore, Jordan failed to demonstrate that expert consultation on the subject would have aided his defense.

expert in hair comparison, this Court has specifically addressed this issue under the prejudice prong of an ineffective assistance of counsel claim.

> Assuming arguendo that competent trial counsel would have employed experts in these areas, Defendant has not shown ... "that 'but for' counsel's unprofessional error, the result of the proceeding would have been different." *Taylor,* 107 N.M. at 73, 752 P.2d at 788. In regards to the hair identification evidence, Defendant's trial counsel was able to discredit the State's hair identification evidence by eliciting on cross-examination of the State's expert witnesses that hair analysis could not conclusively establish identity. Defendant does not explain how a hair analysis expert would be able to cast further doubt on this evidence.

*State v. Hernandez,* 115 N.M. 6, 17, 846 P.2d 312, 323 (1993).

{47} In this case, as demonstrated above, defense counsel's cross-examination of witnesses and closing argument brought out each of the issues raised by the experts at Jordan's evidentiary hearing. As a result, Jordan was not deprived of a meritorious defense at his trial. Dr. Foote conceded that cross-examination could reach the issues about which he testified. Defense counsel may simply have concluded that a battle of experts would not be beneficial to the defense or that it would have unduly emphasized or inadvertently reinforced the State's evidence. "The decision whether to call a witness is a matter of trial tactics and strategy within the control of trial counsel." *State v. Orosco,* 113 N.M. 789, 797, 833 P.2d 1155, 1163 (Ct.App.1991), *aff'd,* 113 N.M. 780, 788, 833 P.2d 1146, 1154 (1992); *accord State v. Harrison,* 2000–NMSC–022, ¶ 63, 129 N.M. 328, 7 P.3d 478 (rejecting a claim of ineffective assistance and concluding that "[d]efense counsel made a tactical decision before trial not to hire a polygraph expert and to rely on his own cross-examination of [the State's expert]"); *Smith v. Angelone,* 111 F.3d 1126, 1132 (4th Cir.1997) (rejecting a claim of ineffective assistance of counsel due to the failure to hire experts because "trial counsel reasonably chose to rely upon cross-examina-

tion of the State's own witnesses to establish his case"). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Thus, we conclude that Jordan has failed to overcome the strong presumption of effective assistance of counsel with respect to trial counsel's decision not to utilize the testimony of expert witnesses.

### 5. Expert Attorney Testimony

{48} Based on the testimony of Nancy Hollander, the district court determined, as a finding of fact, that Jordan's defense counsel's performance fell below an objective standard of reasonableness and that there was a reasonable probability that the result of the trial would have been different if counsel performed reasonably. We do not accept these determinations as findings of fact. The issues of whether defense counsel performed below the level of a reasonably competent attorney and whether deficient performance affected the result of the trial "are mixed questions of law and fact," *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052, which "require[ ] the application of legal principles to the historical facts of this case." *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The district court's determination of these questions represents "a conclusion of law rather than a finding of fact." *Id.* at 341, 100 S.Ct. 1708. We therefore review these findings de novo.

{49} Ms. Hollander's testimony primarily consisted of reviewing the record and the testimony of the other experts who testified at the habeas hearing and opining about her view of the legal significance of that testimony under the *Strickland* test. In fact, Jordan offered Ms. Hollander as a specialist in "analyzing effective versus ineffective assistance of counsel." Ms. Hollander testified at length about her understanding of the Supreme Court's opinion in *Strickland,* and she repeatedly stated that she believed the facts in this case met the *Strickland* test. Rather than acting as an expert witness, Ms. Hollander essentially placed herself in the role of a judge and attempted to advise the

district court about the proper application of the law to the facts and about the proper outcome in this case. We believe it is superfluous for expert witnesses to advise a court, whether it is the district court or an appellate court, about the proper application of existing law to the established historical facts and about the ultimate issue of trial counsel's effectiveness. *See Provenzano v. Singletary*, 148 F.3d 1327, 1331–32 (11th Cir.1998); *Parkus v. State*, 781 S.W.2d 545, 548 (Mo.1989) (en banc); *State v. Thomas*, 236 Neb. 553, 462 N.W.2d 862, 867 (1990); *State v. Moore*, 273 N.J.Super. 118, 641 A.2d 268, 272 (1994); *Commonwealth v. Neal*, 421 Pa.Super. 478, 618 A.2d 438, 439 n. 4 (1992). Thus, to the extent that it concerned the application of the law to the historical facts in this case, we reject Ms. Hollander's testimony concerning defense counsel's performance. To the extent that Ms. Hollander's testimony reached other issues, we find it unpersuasive and unsupportive of the district court's conclusions of law.

### III. Conclusion

{50} We conclude that Jordan has failed to overcome the strong presumption of effective assistance of counsel by demonstrating that his defense counsel's performance fell below that of a reasonably competent attorney. Even if Jordan's defense counsel had acted unreasonably in failing to hire experts for either consulting or testifying, we conclude that there is not a reasonable probability that the result of the trial would have been different. As the United States Supreme Court has emphasized, judicial review of the effectiveness of counsel's performance must be highly deferential, and courts "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. A claim of ineffective assistance of counsel does not present an opportunity for hindsight review. *Hester*, 1999–NMSC–020, ¶ 16, 127 N.M. 218, 979 P.2d 729 ("The mere fact that the defense was not successful does not equate to a finding of ineffective assistance of counsel."). We therefore vacate the district court's grant of Jordan's writ of habeas corpus and dismiss his petition with prejudice.

{51} **IT IS SO ORDERED.**

WE CONCUR: JOSEPH F. BACA, Justice, PETRA JIMENEZ MAES, Justice, JAMES J. WECHSLER, Judge, New Mexico Court of Appeals (sitting by designation), THOMAS G. FITCH, District Judge (sitting by designation).