This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: May 12, 2025**

**No. S-1-SC-40096**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**DAVID F. MORGAN,**

      Defendant-Appellant.

**CAPITAL APPEAL**
**Jeff F. McElroy, District Judge**

Bennett J. Baur, Chief Public Defender
Steven J. Forsberg, Assistant Appellate Defender
Albuquerque, NM

for Appellant

Raúl Torrez, Attorney General
Lee Green, Assistant Solicitor General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

**{1}** A jury found Defendant David Floyd Morgan guilty of the first-degree willful and deliberate murder of James McDowell (Victim), contrary to NMSA 1978, Section 30-2-1(A)(1) (1994). As a result, the district court sentenced Defendant to life imprisonment. *See* N.M. Const. art. VI, § 2 (directing that appeals from a sentence of life imprisonment shall be taken directly to the New Mexico Supreme Court); Rule 12-102(A)(1) NMRA (same).

**{2}**     Defendant argues that (1) insufficient evidence supports the element of deliberate intent in first-degree willful and deliberate murder, (2) the State violated his "right to silence" by using his invocation of that right against him, and (3) he received ineffective assistance of counsel.

**{3}**     We exercise our discretion to decide the case by a non-precedential decision, as the issues raised are disposed of by settled precedent and judicial rules. Rule 12-405(B)(1), (3) NMRA. We affirm the conviction of first-degree felony murder.

## I.     SUFFICIENT EVIDENCE EXISTS THAT DEMONSTRATES DELIBERATE INTENT

**{4}**     Defendant argues that the jury's guilty verdict for first-degree murder with willful and deliberate intent was based only on circumstantial evidence. Defendant contends that the evidence suggests his shooting of Victim was an impulsive reaction to Victim's behavior, which frightened him, even if his response may have been unreasonable. We recount the relevant facts.

**{5}**     Defendant and Victim had been feuding for almost a decade. In 2012, law enforcement cited Defendant for aggravated battery for allegedly hitting Victim with "an unknown metallic object." In 2018, law enforcement charged Defendant with aggravated assault for allegedly pointing a rifle toward Victim. Most recently, their feud included discord over the use of dumpsters in the alleyway and Victim feeding squirrels that Defendant was trying to get rid of in his backyard.

**{6}**     On February 18, 2021, Defendant bought a handgun. The day before the shooting, a dispute arose between the two regarding a dog that was on a long chain in the alleyway between the men's dumpsters. Then, on April 1, 2021, forty-two days after purchasing a handgun, Defendant shot and killed Victim during yet another confrontation between the two men.

**{7}**     Defendant filmed part of the fatal encounter. However, because Defendant only has one arm, he placed the phone in his pocket to hold his handgun during the encounter. As a result, most of the final portion of the video contains only audio.

**{8}**     The video begins with the camera capturing Victim, at some distance, grabbing his groin and stating, "Here . . . you were doing that to me," throwing his hands up in the air, and again stating, "You were doing that to me!" Then, the victim shuffles towards what resembles a rock and states, "Here, you want some? I'll bust you with a f***** rock, motherf*****." Victim picks up a flat rock for approximately one second, and yells, "Here!" and then puts the rock down. Victim then continues yelling at Defendant to "get the f*** out of here, you son-of-a-b****, I'll kick your f***** a**," shuffles toward Defendant with his hands empty, yelling, "Come on!" Then, the video goes black, but the audio continues.

**{9}**     Victim continues yelling and can be heard saying, "You big f***** coward," and asks, "What are you going to do with that?" and says, "Ah, go ahead, go ahead!" Within a second after Victim yells, "Go ahead" a second time, two shots are heard. Almost

simultaneously with a second shot being fired, Victim exclaims, "You mother*****," and mutters something inaudible while Defendant yells at him to "Get the f*** outta here!" Then, approximately less than a second later, a third shot is heard. Immediately, the victim screams in audible pain, "Ah—You son-of-a-b****!" and ten more shots, in quick succession, are heard. Victim is no longer heard after this. Defendant's video and audio of the fatal argument lasted thirty-eight seconds from the beginning of the video to the final gunshot.

**{10}** Defendant then called 9-1-1 and requested an ambulance, stating that Victim "just came at me, and I shot him" and that, as a result, Victim was "gonna be dead." Unprompted during the call, he said, "You all should have done something about the son-of-a-b**** years ago," and "I should have made that son-of-a-b**** stop years ago."

**{11}** While processing the crime scene, two bullets were found underneath Victim's body. Additionally, law enforcement found a set of keys near Victim's head. Upon searching Defendant's phone, law enforcement located 370 internet searches between January and March 2021 with the keyword "handgun." The autopsy of Victim found nine entrance wounds and five exit wounds, with one of those entry wounds being in Victim's back on the left hip.

**{12}** While in custody, Defendant also wrote several letters detailing what he perceived to be the moments leading up to, during, and after the shooting. In particular, Defendant wrote that he acted in self-defense when he shot Victim, who was holding keys in a manner resembling brass knuckles.

**{13}** Defendant also wrote that they were in close proximity when he shot Victim. However, the evidence gathered from the crime scene demonstrated that there was no soot in any of the wounds, and the forensic pathologist could not determine the range of fire.

**{14}** "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "When considering the sufficiency of the evidence, [we do] not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citation omitted). Instead, we view "the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict while at the same time asking whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citations omitted).

**{15}** Section 30-2-1(A)(1) states: "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." In other words, to prove that a defendant committed willful and deliberate murder in the first degree, the State must prove that the

accused had the deliberate intent to take away the life of another. *State v. Garcia*, 1992-NMSC-048, ¶ 17, 114 N.M. 269, 837 P.2d 862. While Section 30-2-1(A)(1) does not define "deliberate intention," UJI 14-201 NMRA of our Uniform Jury Instructions—Criminal defines "deliberate" as:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

The district court gave this instruction to the jury in this case and also provided instructions concerning second-degree murder, voluntary manslaughter, and self-defense. While an intentional killing may lead to a conviction for first-degree murder, second-degree murder, or voluntary manslaughter, first-degree murder is distinguished by the element of deliberate intent. *State v. Adonis*, 2008-NMSC-059, ¶ 14, 145 N.M. 102, 194 P.3d 717.

**{16}** Deliberate intent is seldom established through direct evidence, as it is usually inferred from the circumstances and facts surrounding a homicide. *State v. Vigil*, 1990-NMSC-066, ¶ 2, 110 N.M. 254, 794 P.2d 728. We have upheld jury findings of deliberate intent in cases involving circumstances like a prolonged struggle, the defendant's later descriptions of their actions to others, previous confrontations, threats, shared sources of tension that lead to violence, the manner of killing, and evidence of motive. *E.g.*, *Duran*, 2006-NMSC-035, ¶ 11 (holding the jury could draw logical inferences about defendant's deliberate intent from the multiple wounds, signs of a "prolonged struggle," and the "descriptions of his actions" he gave to others regarding the murder); *State v. Tafoya*, 2012-NMSC-030, ¶ 52, 285 P.3d 604 (noting substantial evidence of deliberation can include "circumstantial evidence of earlier confrontation, threats, debts owed, or other common areas of friction leading to violence"); *State v. Rojo*, 1999-NMSC-001, ¶¶ 22-24, 126 N.M. 438, 971 P.2d 829 (determining deliberate intent from evidence that the method used to kill the victim took several minutes combined with evidence concerning the defendant's motive to kill the victim).

**{17}** The evidence supports the jury's finding that Defendant deliberately intended to take Victim's life. Defendant and Victim had a long-standing feud lasting nearly ten years. This feud involved Defendant allegedly aiming a rifle at Victim, animosity stemming from Victim feeding unwanted squirrels in Defendant's backyard, and Defendant allegedly throwing an "unidentified metallic object" at Victim. Defendant told the 9-1-1 operator, immediately following the shooting and nearly a decade of turmoil, "*I should have made that son-of-a b**** stop years ago.*" Moreover, a recent shared tension existed between Defendant and Victim concerning the dumpsters near their

homes the day before the shooting. Crucially, Defendant wrote letters to family and friends detailing the moments before, during, and after the shooting, stating in one letter: "no guilt or shame here" when describing the fatal encounter. Lastly, Defendant recorded the fatal encounter visually and audibly.

**{18}** While Defendant claimed he shot Victim in self-defense, the jury was free to reject that assertion. The jury received instructions regarding Defendant's self-defense argument and other charges related to Defendant's killing of Victim that did not require deliberate intent: second-degree murder and voluntary manslaughter. Ultimately, the jury found that Defendant possessed the deliberate intent to take Victim's life. And based on the evidence presented and viewing it as a whole, while indulging all reasonable inferences in favor of the jury's verdict, we hold that substantial evidence supports the jury's finding that Defendant deliberately shot Victim with the intent to take his life, thus committing first-degree willful and deliberate murder. A rational jury could have found all the essential elements of the crime proven beyond a reasonable doubt. *See* UJI 14-201 NMRA (providing the jury with instructions for first-degree willful and deliberate murder)

## II. THERE WAS NO FUNDAMENTAL ERROR OR VIOLATION OF DEFENDANT'S RIGHT TO SILENCE

**{19}** Defendant argues that the introduction of his invocation of the "right to silence" was part of the State's plan. He contends that the jury's awareness of his refusal to speak with police damaged his credibility and undermined his self-defense argument, asserting that the State improperly used his invocation as evidence against him. As Defendant concedes, because he failed to object to either instance of the State's alleged comments on his "right to silence," the standard of review is fundamental error. *State v. DeGraff*, 2006-NMSC-011, ¶ 21, 139 N.M. 211, 131 P.3d 61.

**{20}** "New Mexico courts have long held that a *prosecutor* is prohibited from commenting on a defendant's right to remain silent, which is protected under *Miranda v. Arizona*, 384 U.S. 436 (1966)." *State v. McDowell*, 2018-NMSC-008, ¶ 4, 411 P.3d 337 (emphasis added). "Similarly, eliciting testimony or commenting on a defendant's exercise of his or her right to counsel is also reversible error." *Id.* ¶ 5. Our review for fundamental error consists of two parts:

> We first determine whether any error occurred, i.e., whether the prosecutor commented on the defendant's protected silence. If such an error occurred, we then determine whether the error was fundamental. An error is fundamental if there is a 'reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them.' We have recognized that more direct prosecutorial comments on a defendant's invocation of the right to remain silent are more likely to be fundamental error. Applying this analysis, we have held no fundamental error occurred where the prejudicial effect of the prosecutor's comments was minimal and the evidence presented by the prosecution was overwhelming.

*DeGraff*, 2006-NMSC-011, ¶ 21 (citations omitted). "Where no timely objection is made, [we] consider[] only whether the defendant has shown that there is a reasonable probability that the error was a significant factor in the jury's deliberations relative to the other evidence before them." *Id.* ¶ 22.

**{21}** The United States Constitution's Fourteenth Amendment Due Process Clause protects against *prosecutorial* comments on a defendant's post-*Miranda* exercise of their right to remain silent. *See DeGraff*, 2006-NMSC-011, ¶ 12. Furthermore, this Court has clearly stated for almost fifty years that

> We are unwilling to go so far as to say that *any* comment on the defendant's silence must result in a mistrial, or a reversal of the defendant's conviction. We would draw the line between those comments which can be directly attributed to the prosecutor and those comments incorporated within the testimony of a witness.

*State v. Baca*, 1976-NMSC-015, ¶ 5, 89 N.M. 204, 549 P.2d 282 (emphasis added). Accordingly, it follows that "in other circumstances where a witness for the state has made an isolated and unsolicited comment related to a defendant's exercise of his right to remain silent, such a comment has not required reversal on appeal." *State v. Herrera*, 2014-NMCA-007, ¶ 22, 315 P.3d 343; *see State v. Wildgrube*, 2003-NMCA-108, ¶¶ 23-24, 134 N.M. 262, 75 P.3d 862.

**{22}** Deputy John Valdez of the Colfax County Sheriff's Office, who was then serving with the City of Raton Police Department, responded to the crime scene the day of the homicide. Deputy Valdez testified that he was wearing an active body camera when he arrived at the scene, and the video was submitted as an exhibit without objection. Consequently, without objection, pertinent parts of Deputy Valdez's body camera video were played for the jury.

**{23}** In a segment of the body camera video shown to the jury, Deputy Valdez, in response to Defendant, told him, "Let's not talk about anything right now," read Defendant his *Miranda* rights, and when asked if he understood these rights, Defendant replied, "I won't say nothing more; I want a lawyer out Albuquerque or Las Vegas, thank you." When this segment of the body camera video was shown to the jury, there were no objections; Deputy Valdez did not elaborate on it, and the State did not further inquire into Defendant's invocation of his right to remain silent. The pertinent dialogue lasted approximately thirty-seven seconds out of nearly thirteen minutes of body camera footage shown to the jury.

**{24}** After the body camera video segment was shown, the prosecutor asked Deputy Valdez, "So you collect the cell phone, uhm, you take him, uhm, down to Vigil-Maldonado [Detention Center in Raton, New Mexico]; what do you do next?" Deputy Valdez responded that shortly after arrival, he "read [Defendant] the *Miranda* warning again to see if [Defendant] would like to speak or make any statements—which he did not want to speak any further." There were no objections, Deputy Valdez did not testify further about this topic, and the State did not pursue questions about it.

**{25}** The exchange between the prosecutor and Deputy Valdez occurred during a narrative of events and was, therefore, like the circumstances in *Baca*, where this Court determined that the detective's comment was "unsolicited, and possibly inadvertent." *See Baca*, 1976-NMSC-015, ¶¶ 2-3, 5. The prosecutor did not pursue Deputy Valdez's observation of Defendant invoking his right to remain silent or inquire about the reference in any way. Moreover, the State did not draw attention to Defendant's invoking his right to remain silent during its closing argument. Simply put, there was no misconduct by the prosecutor because they did not comment or inquire about Defendant's right to remain silent. *McDowell*, 2018-NMSC-008, ¶ 4 ("[A] *prosecutor* is prohibited from commenting on a defendant's right to remain silent." (emphasis added)). Since no error occurred, we do not evaluate whether any error was fundamental. Therefore, we reject Defendant's claim of fundamental error and any violation of his "right to silence."

## III. DEFENDANT DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL

**{26}** Defendant argues that his attorney provided ineffective assistance of counsel by failing to object when the State repeatedly violated his "right to silence." According to Defendant, there was no valid trial strategy for permitting these violations to go unchallenged. He further asserts that this failure prejudiced him because the jury repeatedly heard testimony about his "refusal to give statements to the police," which harmed his credibility. In a case that he contends hinged on his self-defense claim versus the State's interpretation of circumstantial evidence, that loss of credibility was especially harmful.

**{27}** "We review the legal issues involved with claims of ineffective assistance of counsel de novo." *State v. Crocco*, 2014-NMSC-016, ¶ 11, 327 P.3d 1068.

**{28}** The Sixth Amendment of the United States Constitution's right to counsel guarantees that defendants in state criminal cases have the right to competent effective legal assistance of counsel. *See* U.S. Const. amend. VI. The Sixth Amendment right to effective assistance of counsel is incorporated to the states through the federal Fourteenth Amendment's Due Process Clause. U.S. Const. amend. XIV, § 1.

**{29}** In *Strickland v. Washington*, the United States Supreme Court established two essential requirements that demonstrate how ineffective assistance of counsel resulted in an unreliable conviction that necessitates reversal. 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Lytle v. Jordan*, 2001-NMSC-016, ¶ 25, 130 N.M. 198, 22 P.3d 666 (quoting *Strickland*, 466 U.S. at 687).

**{30}** Concerning the showing of deficiency in performance, the inquiry is whether the defense "counsel's representation fell below an objective standard of reasonableness." *Id.* ¶ 26 (quoting *Strickland*, 466 U.S. at 688). This inquiry must consider all the circumstances surrounding the defense.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 688). "A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct." *State v. Jacobs*, 2000-NMSC-026, ¶ 49, 129 N.M. 448, 10 P.3d 127 (*overruled on other grounds by State v. Martinez*, 2021-NMSC-002, ¶ 72, 478 P.3d 880).

**{31}** Concerning the showing that counsel's deficient performance prejudiced the defense, "'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' In the challenge of a conviction from a verdict, 'the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Lytle*, 2001-NMSC-016, ¶ 27 (brackets omitted) (quoting *Strickland*, 466 U.S. at 694-95).

**{32}** The defendant bears the burden of demonstrating both deficient performance and prejudice, as failing to establish either aspect of the test defeats a claim of ineffective assistance of counsel. *Jacobs*, 2000-NMSC-026, ¶ 51 (*overruled on other grounds by Martinez*, 2021-NMSC-002, ¶ 72).

**{33}** Here, Defendant has not established that his counsel was ineffective. In fact, he has not presented any evidence to suggest that, without his counsel's alleged shortcomings, there was a reasonable possibility that the outcome would have been different. As the State points out, Defendant has difficulty making this argument, as multiple pieces of evidence (from Defendant himself) undermined his credibility, independent of his choice to remain silent. This includes Defendant's cell phone video of the fatal interaction, his comments to the 9-1-1 operators immediately after the killing, the varying accounts of the shooting in letters to family and friends, and inconsistencies between these accounts and the physical evidence. Simply put, Defendant does not demonstrate that if his counsel had objected to Deputy Valdez's testimony or the body camera video regarding Defendant invoking his right to remain silent, the remaining

evidence would not have convincingly proved his guilt for first-degree willful and deliberate murder beyond a reasonable doubt.

**{34}** Since Defendant cannot demonstrate prejudice, we need not evaluate whether his counsel's representation fell below an objective standard of reasonableness. Therefore, we reject Defendant's claim of ineffective assistance of counsel.

**{1}** **CONCLUSION**

**{35}** After considering the briefs and being fully informed on the issues and applicable law, we affirm Defendant's conviction for first-degree willful and deliberate murder.

**{36}** **IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**