# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:   February 16, 2015**

**CASE NO. 33,684**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**MICHAEL ASTORGA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Neil Candelaria, District Judge**

Hector Balderas, Attorney General
Sri Mullis, Assistant Attorney General
Santa Fe, New Mexico

for Plaintiff

Jorge A. Alvarado, Chief Public Defender
David Henderson, Assistant Appellate Defender
Santa Fe, New Mexico

for Defendant

**OPINION**

**CHÁVEZ, Justice.**

{1} A jury convicted Defendant Michael Astorga (Defendant) of one count of first-degree murder, two counts of tampering with evidence, and one count of being a felon in possession of a firearm. These convictions stemmed from the March 2006 shooting death of Deputy James McGrane during a traffic stop in the East Mountain area of Bernalillo County. Because Deputy McGrane was an on-duty peace officer, and because the shooting occurred prior to July 1, 2009, the effective repeal date of the death penalty, the State opted to seek a sentence of death. *See* NMSA 1978, § 31-20A-5 (1981) (listing aggravating circumstances for capital felony sentencing determinations, including the victim's identity as "a peace officer who was acting in the lawful discharge of an official duty when he was murdered," that could support a sentence of death prior to July 1, 2009); 2009 N.M. Laws, ch. 11, §§ 1 to 7 (abolishing the death penalty for all crimes committed on or after July 1, 2009).

{2} At Defendant's request, the district court impaneled a jury under Rule 5-704(D) NMRA (2004) to decide only the question of his guilt. After a full trial on that issue (the guilt phase), the jury returned a guilty verdict on all counts. A separate jury was then impaneled to consider whether Defendant should "be sentenced to death." Rule 5-704(D). After a second trial, which was limited to determining whether Defendant

should receive the death penalty (the penalty phase), the sentencing jury did not unanimously agree that Defendant should be sentenced to death. The district court therefore sentenced Defendant to life imprisonment for the first-degree murder conviction, followed by 13-1/2 years for the remaining convictions.

{3} Defendant advances five grounds for reversal, all limited to purported errors that occurred during the guilt phase of his trial. We consider each argument below and affirm.

**BACKGROUND**

{4} Deputy McGrane was patrolling the area around Tijeras during the early hours of March 22, 2006, when he radioed the dispatch operator that he was pulling over a silver Dodge pickup truck with New Mexico license plate number 459-CDS. About five minutes later, an area resident called 911 and reported that: (1) he had heard two gunshots; (2) he could see a police vehicle pulled over on the side of the road; and (3) it looked like an officer was lying on the ground about ten feet from the vehicle with his flashlight on. The caller also reported that after he heard the shots, his girlfriend saw a white truck "peel[] out of there."

{5} When officers arrived at the scene, they found Deputy McGrane lying face-up on the road with "an apparent gunshot wound to the face." Near Deputy McGrane's

2

body, the officers recovered two spent 10-millimeter casings, both of which had been fired from a Glock handgun. At trial, a pathologist testified that Deputy McGrane had been shot from a distance of "less than 12 inches" and that the bullet had struck him in the chin, severed his spine, and killed him instantly. The pathologist further testified that Deputy McGrane's left leg had multiple abrasions, which "could be" consistent with being run over.

{6} The license plate number given to the dispatch operator by Deputy McGrane was registered to a Dodge truck owned by Defendant. Cash Mart sold the Dodge truck to Defendant, but the title to the truck was still in Cash Mart's name. At the time of the shooting, Defendant was a convicted felon and also had an outstanding warrant for his arrest. Earlier in 2006, Defendant had purchased property in the East Mountains under the name of Donnie Sedillo, looking to make a new life for himself and his family. At about the same time, Defendant had become a regular customer at the Ten Points General Store, where he was known as Donnie Sedillo. Approximately two months before Deputy McGrane's death, Defendant had shown the owner of the general store his 10-millimeter Glock handgun. The 10-millimeter Glock used to kill Deputy McGrane was never recovered. Defendant's truck, however, was found at a residence about 160 yards from Defendant's property.

{7}     After the shooting, law enforcement identified Defendant as a potential suspect in Deputy McGrane's death and embarked upon a multiagency investigation. Defendant was eventually apprehended in Mexico and deported back to New Mexico, where he faced charges relating to Deputy McGrane's death.

{8}     Defendant was tried for an open count of murder, two counts of tampering with evidence (for hiding the truck and the 10-millimeter Glock handgun), and one count of being a felon in possession of a firearm. In addition to the evidence described above, several witnesses testified during the guilt phase about statements that Defendant had made after the shooting and before his capture in Mexico. One of Defendant's friends testified that Defendant came to the friend's house shortly after the shooting and told him, "[The Sheriff's Office] fucked it up again, and I started to do good again, and they fucked it up." Another witness testified that she had first met Defendant in Ciudad Juárez, Mexico during a trip to buy marijuana, and that Defendant had volunteered to her, "I'm Michael Astorga, I blasted that cop." The same witness recounted that, on the same occasion, Defendant had tried to sell her guns, and when she asked him whether any of the guns had been used to kill "the cop," Defendant answered, "No, I got rid of that one."

{9}     Defendant testified at trial and denied shooting Deputy McGrane. He claimed

4

that he was in Albuquerque at the home of two of his friends at the time of the shooting. When Defendant learned that he was wanted for Deputy McGrane's murder, he fled to Mexico because he was "terrified" that he was "going to be killed by the police." The jury rejected Defendant's alibi and convicted him on all counts.

{10} The penalty phase of Defendant's trial then was held before a separate jury to decide whether Defendant should receive a death sentence. The penalty-phase jury found that Defendant knew or should have known that Deputy McGrane was a peace officer performing his duties, and that Defendant intended to kill Deputy McGrane or acted with reckless disregard for Deputy McGrane's life. However, the jury did not unanimously agree that Defendant should be sentenced to death. This appeal followed.

{11} This Court has jurisdiction over Defendant's direct appeal under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA. Defendant advances five grounds for reversal, all limited to purported errors that occurred during the guilt phase of his trial: (1) trial counsel's failure to litigate certain evidence amounted to either fundamental error or ineffective assistance of counsel; (2) the district court improperly excluded a prior inconsistent statement during Defendant's cross-examination of a key witness for the State; (3) the State improperly questioned

Defendant's alibi witness about Defendant's alleged involvement in another murder; (4) the State failed to introduce sufficient evidence of deliberation to support a conviction for first-degree murder; and (5) the district court abused its discretion by denying Defendant's motion for a change of venue.

**DISCUSSION**

**I.      Failure to Litigate Certain Evidence: The "10-8" Call**

{12}      Defendant's first argument for reversal hinges on a piece of evidence that defense counsel claims to have overlooked during the guilt phase of the trial. At the beginning of its case-in-chief, the State played a recording for the jury of Deputy McGrane's call to the dispatch operator shortly before his death. In the recording, Deputy McGrane can be heard describing his location and a vehicle:

|  |  |  |
|---|---|---|
| McGrane: | South 14 and 66, New Mexico, 459, Charles-David-Sam, silver Dodge pickup, one inside. |
| Dispatch: | 10-9 you're . . . South 14 and what mile marker? |
| McGrane: | Mile marker 29. It's cross with 66. |
| Dispatch: | 10-4. |

At the same time as the "10-4," a voice can be heard stating, "10-8," the code that means that an officer has cleared the last call and is back in service. Defense counsel claimed during the penalty phase that he "didn't catch" the 10-8 call during the guilt phase of the trial, and therefore failed to argue its significance to the jury. He also

6

argued that if the "10-8" was Deputy McGrane clearing the call involving Defendant's truck, "then [Defendant] should have never been a suspect. He shouldn't have been a target, much less convicted," because the shooter was someone else.

{13} Defendant now maintains that defense counsel's failure to litigate the 10-8 call during the guilt phase—"whether Deputy McGrane cleared the call . . . 4-1/2 minutes before the report of shots fired"—requires reversal for two reasons. First, citing *Montoya v. Ulibarri*, Defendant argues that the 10-8 call was evidence of his "actual innocence" and that as a result, defense counsel's failure to litigate the call was fundamental error. *See* 2007-NMSC-035, ¶¶ 14, 23-25, 142 N.M. 89, 163 P.3d 476 (holding that Article II, Sections 13 and 18 of the New Mexico Constitution support an actual innocence claim in a habeas corpus proceeding, absent any other constitutional violation at trial). Second, Defendant maintains that the failure to litigate the 10-8 call violated his right to effective assistance of counsel under the Sixth Amendment of the United States Constitution. We address each argument in turn.

**A.      Failure to litigate the 10-8 call was not fundamental error**

{14} Under the doctrine of fundamental error, an appellate court has the discretion to review an error that was not preserved in the trial court to determine if a

defendant's conviction "shock[s] the conscience" because either (1) the defendant is "indisputably innocent," or (2) "a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *State v. Barber*, 2004-NMSC-019, ¶¶ 8, 17, 135 N.M. 621, 92 P.3d 633 (internal quotation marks and citations omitted); *see also* Rule 12-216(B)(2) NMRA. When reviewing for fundamental error, "we first determine if error occurred; if so, we next determine whether that error was fundamental." *Campos v. Bravo*, 2007-NMSC-021, ¶ 8, 141 N.M. 801, 161 P.3d 846.

{15}     Defendant argues that the error in this case was defense counsel's failure to litigate the 10-8 call during the guilt phase, purportedly in violation of Defendant's "right . . . to have this critical evidence introduced at the trial that determined his guilt or innocence." The State concedes that the failure to litigate the 10-8 call was an oversight on defense counsel's part, but it disagrees that the call was evidence of Defendant's actual innocence; instead, from the State's perspective, defense counsel's focus on the call during the penalty phase was merely a "shift in trial strategy" after "the guilt-phase jury rejected [Defendant's] alibi."

{16}     We conclude that defense counsel's potential oversight, while possibly an "error" in layman's terms, is not the sort of legal error that the fundamental error

8

doctrine is intended to remedy. Whether to litigate certain evidence at trial is a matter entrusted to the discretion of defense counsel. *See, e.g.*, *Lytle v. Jordan*, 2001-NMSC-016, ¶ 47, 130 N.M. 198, 22 P.3d 666 (" 'The decision whether to call a witness is a matter of trial tactics and strategy within the control of trial counsel.' " (quoting *State v. Orosco*, 1991-NMCA-084, ¶ 35, 113 N.M. 789, 833 P.2d 1155)). Similarly, whether defense counsel erred by failing to discover the importance of certain evidence is a question of reasonableness considered in light of the record. *See State v. Arrendondo*, 2012-NMSC-013, ¶¶ 38-39, 278 P.3d 517 (noting that for the Supreme Court to remand to the trial court an ineffective assistance of counsel claim raised on direct appeal, a defendant has to demonstrate that "defense counsel's performance" fell outside "the range of reasonable representation," relying upon a defendant's development of the record "with respect to defense counsel's actions" to evaluate said counsel's performance, and refusing to speculate about the reason for trial counsel's delay in discovering potentially exculpatory evidence). Thus, to claim that defense counsel's failure to "catch" the 10-8 call during the guilt phase was error, is really just to challenge the adequacy of defense counsel's performance at trial. This is not a claim of fundamental error, but one of ineffective assistance of counsel, a claim to which we now proceed.

**B.    Defendant has not made a prima facie claim of ineffective assistance of counsel**

{17}    Defendant contends that defense counsel's failure to litigate the 10-8 call was ineffective assistance of counsel under the Sixth Amendment of the United States Constitution. "To establish ineffective assistance of counsel, a defendant must show: (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.' " *State v. Paredez*, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). On direct appeal, the record is frequently inadequate to either evaluate counsel's performance or to determine prejudice. *Arrendondo*, 2012-NMSC-013, ¶ 38 ("The record is frequently insufficient to establish whether an action taken by defense counsel was reasonable or if it caused prejudice."). As a result, we prefer an ineffective assistance of counsel claim to be brought in a habeas corpus proceeding, "so that the defendant may actually develop the record with respect to defense counsel's actions." *Id*. However, if the defendant presents a prima facie case on direct appeal, we will remand the ineffective assistance of counsel claim to the district court. *Id.* Absent a prima facie case, we presume that counsel's performance was reasonable. *Id.*

{18}    To determine if defense counsel's performance was deficient, we consider

whether it " 'fell below an objective standard of reasonableness.' " *State v. Hunter*, 2006-NMSC-043, ¶ 13, 140 N.M. 406, 143 P.3d 168 (quoting *Strickland*, 466 U.S. at 688). This is not an easy standard for convicted defendants to meet because "[w]e indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Hunter*, 2006-NMSC-043, ¶ 13 (internal quotation marks omitted). "A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct." *State v. Ortega*, 2014-NMSC-017, ¶ 55, 327 P.3d 1076 (quoting *Jordan*, 2001-NMSC-016, ¶ 26).

{19} In this case, defense counsel stated that he "made a mistake and overlooked evidence" concerning the 10-8 call. Defendant contends that this admission demonstrates that the failure to litigate the call was a mistake and not the result of trial tactics or strategy. We disagree. Without further factual development, defense counsel's statement is ambiguous and therefore insufficient to support a prima facie ineffective assistance claim, particularly since the State has not had an opportunity to cross-examine counsel about his alleged oversight. When defense

counsel stated that he "didn't catch . . . at trial" the evidence concerning the clearing of the call, he may have meant, as Defendant suggests, that he did not *notice* the 10-8 call until after the jury returned its guilty verdict against Defendant. But the State offers an alternative meaning: that defense counsel noticed the call and disregarded it for some strategic reason until he "caught" its significance after the jury found Defendant guilty.

{20}    The State's interpretation of defense counsel's words appears plausible, given that defense counsel reasonably could have concluded that the 10-8 call was not helpful to Defendant's case. Defense counsel could have decided not to emphasize the 10-8 call because the jury had the recording of the entire call to dispatch during its deliberations and, as we explain more fully below, the phrase "10-8" sounds as though it may have been made on an overlapping airwave by an officer other than Deputy McGrane. Alternatively, defense counsel may have concluded that even if the 10-8 call had been made by Deputy McGrane, the call would not have proved that Deputy McGrane necessarily terminated all contact with Defendant. Under these circumstances, we cannot determine whether defense counsel's performance "fell below an objective standard of reasonableness" without affording the State an opportunity to question defense counsel about the precise meaning of his statement

12

and whether he chose to not litigate the 10-8 call as a matter of trial strategy. *Hunter*, 2006-NMSC-043, ¶ 13 (internal quotation marks and citation omitted); *see also Arrendondo*, 2012-NMSC-013, ¶ 38-39 (noting that the record is "frequently insufficient to establish whether an action taken by defense counsel was reasonable" and refusing to speculate, for example, as to why a defense counsel delayed in learning of a piece of evidence, so as to conclude that the defendant had failed to make a prima facie claim of ineffective assistance of counsel).

{21} Even assuming that defense counsel's performance was deficient, Defendant has not established that he was prejudiced by the deficient performance. To prove prejudice,

> [A] defendant must demonstrate that counsel's errors were so serious, such a failure of the adversarial process, that such errors undermine[] judicial confidence in the accuracy and reliability of the outcome. A defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289 (second alteration in original) (internal quotation marks and citations omitted).

{22} Defendant forcefully argues that the result of the guilt phase would have been different had defense counsel litigated the 10-8 call. He contends that the dispatch call was central to the State's case, including the State's argument that the call

13

showed that Deputy McGrane "had acted as a witness to his own murder." According to Defendant, the 10-8 call potentially flips the meaning of the dispatch call on its head by suggesting that Deputy McGrane had already cleared his investigation of Defendant's truck "minutes before he was killed."

{23}     We are not persuaded that, had defense counsel litigated the 10-8 call during the guilt phase, there was a reasonable probability that the result would have been different. We agree with the State that the relevance of the 10-8 call went to the question of Defendant's identity as the shooter. Defense counsel argued as much during the penalty phase: "If . . . th[e] dispatch tape is correct and [Deputy McGrane] cleared that scene, then [Defendant] should have never been a suspect. He shouldn't have been a target, much less convicted." However, the guilt-phase jury heard ample additional evidence from which it could have concluded that Defendant killed Deputy McGrane. Such evidence includes Defendant's own admissions concerning his role in the shooting, the facts supporting the inference that Defendant owned a Glock handgun (which was the murder weapon), and the facts indicating that the truck Deputy McGrane had pulled over prior to his murder was owned by Defendant. Cash Mart sold the Dodge truck to Defendant, but the title to the truck was still in Cash Mart's name. In the face of all of the evidence of Defendant's identity as Deputy

14

McGrane's killer, we are not persuaded, to a reasonable probability, that litigating the 10-8 call would have changed the outcome of the guilt phase of Defendant's trial. The 10-8 call was just another piece of evidence for the jury to weigh in deciding whether Defendant murdered Deputy McGrane.

{24} Our conclusion is based on more than mere speculation. Due to the procedural history of this case, the State effectively had to re-litigate the question whether Defendant murdered Deputy McGrane during the penalty phase, and defense counsel took full advantage of the second opportunity to argue Defendant's innocence. *See* UJI 14-7014 NMRA (providing that, to find the defendant guilty of the aggravating circumstance of "murder of a peace officer," the jury must find, inter alia, that "the defendant knew or should have known that *(name of victim)* was a peace officer" and that Defendant "intended to kill or acted with a reckless disregard for human life and knew that [his] [her] acts carried a grave risk of death"). The 10-8 call featured prominently in that phase of the proceedings, and the jury heard conflicting testimony about whether the call had been made by Deputy McGrane or by another officer on an overlapping airwave. Significantly, defense counsel placed the 10-8 call front-and-center during his closing remarks:

> You know, Folks, I should sit down now. This case should be over with because [the dispatch recording] alone, if anybody would have ever

taken the time to look at it, to think about it, to study, to get the CAD[1] reports to listen to what was really said in this case should have ended this. Why? Because [Deputy McGrane] went 10-8. The State may get up and say, well, we don't think that was his voice. I'm sorry, it was your dispatch tape. It was your operator. It was your dispatch operator, it was your exhibit. You're the one that admitted it. You're the one that told us that. I'm sorry, that is what they said. There is no way around that, and there is no way around it for a jury either. It's cold and clear as you can get it.

The penalty-phase jury considered this conflicting evidence and argument together with the recording and transcript of the dispatch call, and unanimously found the aggravating circumstance of "murder of a peace officer." Thus, even after the 10-8 call was fully litigated, the penalty-phase jury unanimously concluded that Defendant had murdered Deputy McGrane. We therefore cannot say to a reasonable probability that litigating the 10-8 call during the guilt phase would have produced a different result.[2]

---

[1]CAD reports are "everything that the [law enforcement] dispatcher types in on [his or] her computer." These CAD reports include information concerning the "call, the location," etc. Dispatchers "dispatch[] [law enforcement] units to their calls and tak[e] care of all units."

[2]At oral argument, this Court questioned Defendant's appellate counsel about whether the phrase "10-8" was actually part of the larger phrase, "two-oh-nine, 10-8," that can be heard immediately preceding and overlapping with the dispatch operator's "10-4." The parties were granted leave to file supplemental briefing to address the issue, and both acknowledged that the larger phrase, "two-oh-nine, 10-8" or "two-one-niner, 10-8," can be heard on the recording. Defendant's appellant counsel acknowledges that the significance of this larger phrase was neither argued nor raised

16

{25} We hold that Defendant has not made a prima facie case of ineffective assistance of counsel on direct appeal. However, Defendant is not precluded from pursuing this claim in a separate habeas proceeding, where he may get the opportunity to fully litigate the reasonableness of defense counsel's failure to litigate the 10-8 call and whether he was prejudiced by that failure. *See Arrendondo*, 2012-NMSC-013, ¶¶ 42-44 (noting that although there was not "enough evidence to properly address" the defendant's ineffective assistance of counsel claim, the defendant was "free to pursue habeas corpus proceedings where he may actually develop the record" with respect to said claim).

## II.      Gonzales's Prior Inconsistent Statement

{26} Defendant next argues that the district court improperly prevented him from calling a witness to impeach the testimony of Ernest Gonzales, the owner of the Ten Points General Store, who testified that he had seen Defendant several weeks before Deputy McGrane's death with a 10-millimeter Glock handgun—the same type of handgun used to shoot Deputy McGrane. Gonzales testified that Defendant was a regular customer at Gonzales's convenience store and that on one occasion, Defendant noticed the 9-millimeter Glock handgun that Gonzales carried on his hip

during Defendant's trial.

17

and said "I've got one similar to that." Some time later, Defendant again visited Gonzales's store and said, "Oh, I brought that gun so I could show you the one that I had like yours." Gonzales testified that he picked up Defendant's gun and saw that it said "Glock" and " '10 mm' right on it."

{27} On cross-examination, defense counsel asked Gonzales about his previous statement to a defense investigator about why Gonzales thought that the gun Defendant had shown him was a 10-millimeter Glock. According to defense counsel, Gonzales told the investigator that he actually never saw the "10 mm" stamp, and that instead, Defendant had told Gonzales that it was a 10-millimeter handgun when Defendant pulled it out of his pocket. Defense counsel pressed Gonzales about his prior statement that he had not actually looked at the stamp, and Gonzales responded, "From what I saw, that's what I saw," but he did not remember exactly what he had told the investigator about seeing the stamp.

{28} Defendant later tried to call the investigator to testify about Gonzales's prior statement. The State objected, arguing that Gonzales had not testified in a manner that was inconsistent with the prior statement. In considering the objection, the district court asked sua sponte, "Prior inconsistent statements, don't they have to be under oath as well, Counsel?" Defense counsel responded, "No, not under the rule. That

18

changed some years ago." Unconvinced, the district court asked counsel for both the State and the defense to research the "prior inconsistent rule" over recess. Upon their return, the court conferred with counsel off the record and disallowed the investigator's testimony, apparently because Gonzales's prior statement was not given under penalty of perjury as required for prior inconsistent statements admitted under Rule 11-801(D)(1)(a) NMRA (2006). Defense counsel then made the following statement "to make a record":

> I understand the Court has examined the rule and that rule requires that that be under oath before we can impeach in the fashion that I desire to do such. I respectfully disagree with the rule. I think that it denies us the opportunity to present evidence that would contradict what Mr. Gonzales is saying, but I do understand the rule.

{29} Defendant argues on appeal that the district court erred by disallowing the investigator's testimony under Rule 11-801(D)(1)(a), contending for the first time that the testimony was admissible under Rule 11-613(B) NMRA (1993) as extrinsic evidence of a prior inconsistent statement for impeachment purposes. We review de novo whether the district court applied the correct evidentiary rule to exclude the investigator's testimony. *See, e.g.*, *State v. Torres*, 1999-NMSC-010, ¶ 28, 127 N.M. 20, 976 P.2d 20 ("[T]he threshold question of whether the trial court applied the correct evidentiary rule or standard is subject to de novo review on appeal."). Given

19

the apparent confusion that arose in this case, we take this opportunity to clarify the different purposes and effects of these two rules, which both relate to the admissibility of prior inconsistent statements.

**A.     Rules 11-613 and 11-801(D)(1)(a) govern different aspects of the admissibility of a prior inconsistent statement**

{30}     Under the New Mexico Rules of Evidence, a prior inconsistent statement has three elements: (1) the statement was made by a witness who testifies at trial; (2) the statement was given before the witness testifies at trial; and (3) the statement is inconsistent with the witness's trial testimony. *See* Rule 11-801(D)(1)(a). Because of the second element, a prior inconsistent statement is not given "at the current trial or hearing"; thus, the admissibility of this prior statement invariably implicates the rule against hearsay. Rule 11-801(C) (defining hearsay as a statement that is not made while testifying at the current trial or hearing and that is offered to prove the truth of the matter asserted in the statement); Rule 11-802 NMRA (providing that hearsay is inadmissible except as provided by rule or statute).

{31}     However, courts have long recognized that prior inconsistent statements differ from other types of out-of-court statements in several important ways. First, prior inconsistent statements are inherently relevant for a "non-hearsay" purpose: impeaching a witness's credibility. *See, e.g.*, *State v. Carlton*, 1971-NMCA-019, ¶ 34,

20

82 N.M. 537, 484 P.2d 757 ("It is fundamental that a statement, written or oral of a witness as to a material matter inconsistent with his testimony at trial is admissible for impeachment purposes."); *see also* 3A John Henry Wigmore, *Evidence in Trials at Common Law* § 1017, at 993 (James H. Chadbourn ed., 1970) ("We place [the witness's] contradictory statements side by side, and, as both cannot be correct, we realize that in at least one of the two he must have spoken erroneously. Thus, we have detected him in one specific error, from which may be inferred a capacity to make other errors."). As a result, a prior inconsistent statement used for impeachment is not hearsay because it is not admitted for the truth of the matter asserted; rather, "it is the fact of the inconsistency that is admissible, not the substantive truth or falsity of the prior statement." *State v. Macias*, 2009-NMSC-028, ¶ 20, 146 N.M. 378, 210 P.3d 804, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, 275 P.3d 110.

{32}     A second distinguishing feature of a prior inconsistent statement is the declarant's presence in the courtroom. *See* Rule 11-801(D)(1)(a). Because the declarant actually testifies at trial and is subject to cross-examination about the prior statement, the usual concerns about the reliability of the out-of-court statement are greatly diminished. *See, e.g.*, 4 Christopher B. Mueller & Laird C. Kirkpatrick,

21

*Federal Evidence* § 8:1, at 9 (4th ed. 2013) (noting that prior inconsistent statements, inter alia, "are often more reliable than testimony because [prior inconsistent statements are] closer in time to the matter reported and less likely to have been influenced by the controversy").

{33}     Rules 11-613 and 11-801(D)(1)(a) codify the differences between prior inconsistent statements and other out-of-court statements, albeit in a somewhat indirect manner. Rule 11-613 is a procedural rule that governs two aspects of how a prior inconsistent statement may be used for impeachment purposes. Our focus here is on Rule 11-613(B), which provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." The rule thus presumes that a witness may be impeached by questioning the witness about a prior inconsistent statement, and the rule allows, but does not require, extrinsic evidence of the prior statement when the requirements of the rule have been satisfied. *See* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 613.05[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2014) ("Rule 613 does not require a party who seeks to impeach a witness through alleged prior

inconsistent statements to present extrinsic evidence of the statements.").

{34}     Rule 11-801(D)(1)(a), by contrast, embodies a limited recognition of the notion that a prior inconsistent statement is more reliable than other types of out-of-court statements. Rule 11-801(D)(1)(a) singles out one category of prior inconsistent statements as "not hearsay" because of the circumstances under which the statements are made.[3] *See* 5 Weinstein & Berger, *supra*, § 801.21[1] ("[P]rior inconsistent statements that fulfill the requirements of Rule 801(D)(1)(A) are uttered under circumstances that make them at least as reliable as in-court testimony."). Under Rule 11-801(D)(1)(a), a prior inconsistent statement is "not hearsay" when the declarant testifies and is subject to cross-examination about the prior statement, and the statement was "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Because the statement is "not hearsay," it can be admitted as substantive evidence—"to prove the truth of the matter asserted" in the statement and not just for impeachment. Rule 11-801(C)(2) NMRA. This can be particularly important in a case in which the prior statement is the only evidence

---

[3]Before 1995, Rule 11-801(D)(1)(a) excluded *all* prior inconsistent statements from the definition of hearsay. Rule 11-801(D)(1)(a) NMRA (1973, amended 1993). The rule was amended in 1995, consistent with Federal Rule of Evidence 801(d)(1)(a), to exclude only statements "given under oath subject to the penalty of perjury." Rule 11-801(D)(1)(a) (1995, amended 2012).

presented on a particular element of a crime. *Cf.* 5 Weinstein & Berger, *supra*, § 801.21[5] ("If a statement admitted under Rule 801(d)(1)(A) is the only evidence on an element in an offense charged, the court must determine whether the nature of the evidence is sufficient for conviction.").

{35}   Thus, extrinsic evidence of a prior inconsistent statement—including a statement admitted under Rule 11-801(D)(1)(a)—is always admissible for impeachment purposes, subject to the requirements of Rule 11-613 and to the general rules governing relevance. *See, e.g.*, *State v. Davis*, 1981-NMSC-131, ¶¶ 18-20, 97 N.M. 130, 637 P.2d 561 (holding that the district court properly relied on Rule 11-403 NMRA to exclude extrinsic evidence of a prior inconsistent statement when the probative value of the evidence was substantially outweighed by the "needless presentation of cumulative evidence"). However, to introduce a prior inconsistent statement for its truth—as substantive proof of the matter asserted in the prior statement—the statement must have been given under "penalty of perjury" as provided in Rule 11-801(D)(1)(a) or fall within a hearsay exception under Rule 11-803 NMRA (1993). Due to the potential for misuse of a statement admitted only for impeachment purposes, a limiting instruction is often appropriate when a prior inconsistent statement cannot be considered for its truth. *See* UJI 14-5009 NMRA

24

(articulating jury instructions concerning the admission of evidence for a limited purpose); *see also* 3 Mueller & Kirkpatrick, *supra*, § 6:99, at 614 ("Of course the court on request should give an appropriate limiting instruction advising the jury that the statement is admissible only for whatever light it might shed on the credibility of the witness, and not as proof of what the statement asserts . . . .").

**B.      The district court erred by relying on Rule 11-801(D)(1)(a) to exclude extrinsic evidence of Gonzales's prior inconsistent statement**

{36}      In this case, Defendant's cross-examination of Gonzales emphasized that Gonzales's in-court testimony (about having seen the "10 mm" stamp on the Glock handgun) was inconsistent with his previous statement to the investigator that he never actually saw the stamp. The record also shows that Defendant gave Gonzales a chance during cross-examination to explain or deny his prior statement and that the State had the opportunity to question Gonzales about the prior statement during his re-direct examination. These circumstances easily satisfy the requirements for the admission of extrinsic evidence of a prior inconsistent statement for the purpose of impeachment under Rule 11-613(B).

{37}      Further, nothing specific in the record indicates that Defendant intended to argue the prior statement for its truth. Indeed, in responding to the State's objection to the investigator's testimony, defense counsel explicitly stated that he had laid the

25

proper foundation to "impeach" Gonzales, although he did not directly reference Rule 11-613. Thus, Defendant's purpose for the investigator's testimony seemingly was to cast doubt on Gonzales's credibility—not to prove that Gonzales did not actually see the "10 mm" stamp. Under these circumstances, when the prior statement was offered only to impeach Gonzales and not to prove its truth, Rule 11-801(D)(1)(a) simply was not implicated.

{38}     The State argues that irrespective of the rule upon which the district court relied to exclude the investigator's testimony, Gonzales's trial testimony was not inconsistent with his prior statement. Because Gonzales only testified that he could not remember what he might have said and did not dispute what he may have told the investigator, the State maintains that Gonzales "made no prior inconsistent statement."

{39}     The State's argument misses the mark. In evaluating whether a witness's trial testimony is inconsistent with the witness's prior statement, the question is not whether the witness denies—or even recalls—having made the *prior statement*. In fact, under "current practice," the witness need not even be confronted with the prior statement before extrinsic evidence is presented as long as the witness has an opportunity to "explain or deny" the statement at some point during the proceeding.

26

*See State v. Dominguez*, 2007-NMSC-060, ¶¶ 18-19, 142 N.M. 811, 171 P.3d 750 ("[T]he federal rule, identical to our Rule 11-613(B), 'permits departure from the traditional, although often still preferred, method of confronting a witness with his inconsistent statement prior to its introduction in to evidence.' " (quoting *State v. Gomez*, 2001-NMCA-080, ¶ 14, 131 N.M. 118, 33 P.3d 669)); *see also* 3 Mueller & Kirkpatrick, *supra*, § 6:101, at 638-39 ("Rule 613 does not specify any particular time or sequence, so the chance for explanation or denial (and for additional questioning by parties defending or repairing the witness' credibility) may be provided either before or after the statement has been proved by extrinsic evidence." (internal quotation marks and footnote omitted)).

{40} The question, instead, is simply whether the *substance* of the witness's trial testimony is inconsistent with the prior statement. *See*, *e.g.*, *State v. Varela*, 1999-NMSC-045, ¶ 36, 128 N.M. 454, 993 P.2d 1280 (holding that "there must be substantive inconsistencies" to justify admitting a prior inconsistent statement into evidence). In this case, Gonzales testified at trial that he actually saw the "10 mm" stamp on the Glock handgun. Defendant sought to impeach Gonzales with his prior statement that he did not actually look at the stamp. These statements are clearly

27

inconsistent, irrespective of Gonzales's ability to recall the prior statement.[4] The requirements of Rule 11-613(B) were therefore satisfied, and the investigator's testimony was admissible to impeach Gonzales, subject to the district court's broad discretion under Rule 11-403. We note that defense counsel failed to cite Rule 11-613(B) to the district court when he conceded that the testimony did not meet the required elements for admissibility under Rule 11-801(D)(1)(a) and did not emphasize his intent to simply introduce the evidence as impeachment evidence. Nonetheless, excluding the extrinsic evidence of Gonzales's prior inconsistent statement under Rule 11-801(D)(1)(a) was error when the evidence was offered only for the purpose of impeachment. We now address whether the improper exclusion of the investigator's testimony requires reversal.

**C.  The error was harmless**

{41}  The State contends that Defendant failed to preserve his argument that the evidence was admissible under Rule 11-613(B), and we therefore must limit our review to fundamental error. As we previously recounted, the record suggests that

---

[4]The State does not argue, and we do not decide, whether extrinsic evidence of a prior inconsistent statement is admissible when the witness admits having made the prior statement. *See, e.g.*, *United States v. Soundingsides*, 820 F.2d 1232, 1240 (10th Cir. 1987) (holding that it was error to admit extrinsic evidence of prior inconsistent statements when the witnesses acknowledged having made the inconsistent statements; there was no need for further proof of the statements).

28

defense counsel conceded that the testimony was inadmissible under Rule 11-801(D)(1)(a) and did not alert the district court to its admissibility under Rule 11-613(B). Under a crabbed reading of our preservation requirements, we could limit our review either to plain error under Rule 11-103(E) NMRA or to fundamental error. *See, e.g.*, *Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 22, 133 N.M. 669, 68 P.3d 909 (explaining that Rule 12-216(A) NMRA requires a party to object to a trial court's ruling "on the same grounds argued in the appellate court" (internal quotation marks and citations omitted)); *see also State v. Lucero*, 1993-NMSC-064, ¶ 12, 116 N.M. 450, 863 P.2d 1071 (" 'Even if the defendant did not raise proper objections at trial, he may be entitled to relief if the errors of which he complains on appeal constituted plain error . . . or fundamental error.' " (quoting *State v. Barraza*, 1990-NMCA-026, ¶ 17, 110 N.M. 45, 791 P.2d 799) (internal citations omitted)). However, defense counsel's explanation that he intended to offer the investigator's testimony for the purpose of impeachment—a non-hearsay purpose firmly embedded in our Rules of Evidence—was sufficiently specific to preserve the issue for appellate review.

{42}     When an error is preserved, we review for harmless error, and our inquiry depends on whether the error was constitutional. *See Tollardo*, 2012-NMSC-008, ¶

36. Defendant contends that the exclusion of the investigator's testimony violated his Sixth Amendment right of confrontation and his Fourteenth Amendment right to due process. The State persuasively argues that these contentions lack merit, and it appears that Defendant abandoned them in his reply brief. Even so, we note that Gonzales testified at trial, and defense counsel actually cross-examined him about his prior statement. Further, defense counsel argued in his closing remarks that Gonzales was not a credible witness based, in part, on his inconsistent statements about having seen the "10 mm" stamp. We therefore fail to see how excluding the investigator's testimony implicated Defendant's confrontation or due process rights.

{43} Absent a constitutional violation, we look to whether there is a reasonable probability that the error affected the verdict. *See id.* Defendant bears the initial burden of demonstrating that he was prejudiced by the error. *State v. Holly*, 2009-NMSC-004, ¶ 28, 145 N.M. 513, 201 P.3d 844. Apart from the claimed constitutional errors addressed above, Defendant contends that the absence of the investigator's testimony "permitted the jury erroneously to infer [that] the statement had not in fact been made." We disagree. Defense counsel impeached Gonzales with his prior inconsistent statement during cross-examination, and Gonzales did not deny that he may have told the investigator that he did not actually look at the "10 mm" stamp

when Defendant showed him Defendant's handgun. Also, irrespective of whether Gonzales saw the "10 mm" stamp or Defendant told him that the handgun was a 10-millimeter Glock, both statements confirmed that Defendant had shown Gonzales the type of weapon used to kill Deputy McGrane. Thus, extrinsic evidence of the prior statement was minimally relevant to Gonzales's credibility on the material issue at hand, and therefore such evidence could have been excluded as causing "undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 11-403; *see also Davis*, 1981-NMSC-131, ¶¶ 17-20 (holding that the district court did not abuse its discretion by excluding extrinsic evidence of a prior inconsistent statement when the defense attorney had cross-examined the witness about the statement and argued the inconsistencies to the jury during closing arguments).

{44}     We could affirm the exclusion of the investigator's testimony on the basis of Rule 11-403 alone. *See, e.g., Macias*, 2009-NMSC-028, ¶ 17 ("The trial record does not clearly reveal the trial court's specific reason for admitting the statements, but we may uphold the judge's decision if it was right for any reason."). However, we also conclude that the exclusion of the investigator's testimony was harmless error because whether the investigator saw the stamp on the gun or Defendant told the investigator that the gun was a 10-millimeter Glock, there is no reasonable probability

that impeachment of the investigator would have affected the verdict.

**III.    Improper Questioning about Defendant's Involvement in Another Murder**

{45}    Defendant next contends that his conviction should be reversed because of a question asked by the State during its cross-examination of one of Defendant's alibi witnesses, Yolanda Saiz, that improperly referred to Defendant's suspected involvement in a prior homicide. Approximately five months before Deputy McGrane's death, Defendant had been charged with an open count of murder for the death of Candido Martinez, and a warrant had been issued for Defendant's arrest. In a pretrial motion, the State argued that evidence of the outstanding warrant was "essential to prove the defendant's motive and intent at the time of the shooting" of Deputy McGrane. The State therefore asked the district court to "admit evidence that a warrant had been issued for the defendant for [the] previous murder, and that the warrant was in effect at the time of the murder of Deputy McGrane."

{46}    Over Defendant's objection, the district court granted the motion in part, ruling that the State could inform the jury that Defendant had an outstanding arrest warrant at the time of Deputy McGrane's death. However, the court also ruled that the State could not introduce evidence that the warrant was for murder, reasoning that such evidence would be highly prejudicial to Defendant. The district court later rejected

the State's follow-up request to introduce evidence that the warrant was simply for a felony.

{47} The State repeatedly and forcefully renewed its motion to inform the jury that the warrant was for murder, also arguing that the evidence was necessary to provide context for a central theme of the defense: that several defense witnesses had given inconsistent statements to law enforcement because they had been terrorized during the manhunt for Defendant. The State contended that the only way to rationalize the aggressive search for Defendant by law enforcement not only was to explain that Defendant was suspected of Deputy McGrane's murder, but he also was a convicted felon who was wanted for another murder, and who was believed to be armed and dangerous. The district court denied many such requests by the State, reasoning each time that the fact that the warrant was for murder would be highly prejudicial to the defense.

{48} Before the State's cross-examination of Saiz, the State renewed its request to inform the jury that the outstanding warrant was for murder. Saiz had given several conflicting statements to the police about her knowledge of Defendant's whereabouts at the time of Deputy McGrane's death. In the midst of questioning Saiz about a number of inconsistencies between one of her prior statements and her trial testimony,

the State asked the following question:

> Q:    In fact, what you said [was], "If you guys would have caught him before, he wouldn't have killed somebody else," that's what you said in your first statement, isn't it?
>
> A:    I mean, that's what it says there, yes.

The question and answer were admitted without objection, without any reaction from defense counsel or the district court, and were never alluded to again during the proceedings.

{49}    Defendant contends that the State "intentionally used a statement concerning [the] other homicide to impeach a key defense witness" in violation of the district court's repeated rulings that "evidence regarding the unrelated homicide should be excluded." Defendant acknowledges that the asserted error was not preserved, and therefore asks this Court to review for plain error. *See* Rule 11-103(E) ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved."). The State counters that we should limit our review to the more stringent fundamental error standard. Under either standard, we must be convinced that "admission of the evidence in question 'creates grave doubts concerning the validity of the verdict.' " *State v. Rojo*, 1999-NMSC-001, ¶ 45, 126 N.M. 438, 971 P.2d 829 (quoting *Lucero*, 1993-NMSC-064, ¶ 12).

{50}    The first step in a plain or fundamental error analysis is to determine whether

34

the evidence in question was erroneously admitted. *See Campos*, 2007-NMSC-021, ¶ 8 ("[W]e first determine if error occurred; if so, we next determine whether that error was fundamental."). Defendant contends that the State's question was unrelated to the impeachment of Saiz and that "its only connection to the issues before the jury was as highly improper propensity evidence." We disagree. Saiz testified that Defendant was at her house until sometime "after midnight" on the morning of March 22, 2006, the morning that Deputy McGrane was killed shortly after 12:44 am. As a result, her prior inconsistent statement to the police that, "If you guys would have caught him before, he wouldn't have killed somebody else," was relevant to her credibility. Saiz's prior statement clearly acknowledged that she found Defendant's involvement in Deputy McGrane's death to be at least plausible, which would not be true had Defendant been at her house that morning. Thus, the prior statement was relevant to show that Saiz had been untruthful, either in her statement to the police or in her testimony at trial. *See Macias*, 2009-NMSC-028, ¶ 20 ("We place [the witness's] contradictory statements side by side, and, as both cannot be correct, we realize that in at least one of the two he must have spoken erroneously. Thus, we have detected him in one specific error, from which may be inferred a capacity to make other errors." (alteration in original) (quoting 3A Wigmore, *supra*, § 1017, at 993)).

35

{51} Given the relevance of the prior statement, it could only have been excluded if its relevance was "substantially outweighed by a possibility of . . . unfair prejudice." Rule 11-403. The district court had determined that evidence that the warrant was for murder was inadmissible under Rule 11-403, and it had staunchly adhered to that holding throughout the trial—with the vigorous support of defense counsel. That neither the district court nor defense counsel reacted to the State's question leads us to conclude that, in the context of the trial, the question was not as "highly prejudicial" as Defendant now contends. In fact, the State renewed its request to inform the jury that the warrant was for murder during Saiz's redirect examination—*after* it had asked the question in dispute—and neither the district court nor defense counsel took issue with the State's previous question.

{52} The single question and answer was the lone reference to Saiz's prior statement that the jury heard in a trial that lasted more than two weeks, a trial that, as explained later in this opinion, included abundant evidence of Defendant's guilt. Thus, even under the harmless error standard that applies to errors that are properly preserved, the admission of the question would not require reversal. *See State v. Serna*, 2013-NMSC-033, ¶ 23, 305 P.3d 936 ("When assessing the probable effect of evidentiary error, 'courts should evaluate all of the circumstances surrounding the error.' This

36

includes the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." (quoting *Tollardo*, 2012-NMSC-008, ¶ 43)). As a result, even if the admission of the State's question was erroneous, the error does not require reversal under either the plain or fundamental error doctrines.

{53} Defendant also suggests that we should evaluate the State's question under the standard applied to prosecutorial misconduct arising from the intentional introduction of evidence about a defendant's post-arrest silence, as in *State v. Hennessy*, 1992-NMCA-069, ¶¶ 21-23, 114 N.M. 283, 837 P.2d 1366, *overruled on other grounds by Lucero*, 1993-NMSC-064. In *Hennessy*, the Court of Appeals reversed the defendant's conviction based on a finding of fundamental error after the prosecution impeached the defendant using his "failure" to contact the police to correct a false statement that he had made upon his initial arrest. *Hennessy*, 1992-NMCA-069, ¶ 7. On re-direct examination, the defendant explained that his attorney had counseled him "not to say anything to anybody about the case." *Id*. During closing arguments, the prosecution referred to the defendant's testimony as evidence that the defendant "never bothered" to tell the truth, and that his attorney had told him not to tell the

truth. *Id*. The Court reasoned that fundamental error occurred because the prosecution "intentionally elicited direct comment on the exercise of [the] defendant's rights, despite [the Court of Appeals'] repeated admonitions not to do so." *Id.* ¶ 23.

{54} Even if we were to agree that the State's question in this case amounted to prosecutorial misconduct, *Hennessy* is not on point. The questioning in *Hennessy* implicated the defendant's Fifth Amendment right to remain silent, whereas here, Defendant does not contend that the State's question about Saiz's prior statement violated anything other than Rule 11-403. In addition, unlike the single, fleeting question in this case that was never referred to again, the prosecution in *Hennessy* repeatedly questioned the defendant about his purported failure to correct the false statement and referenced the exchange during closing arguments. *Id.* ¶¶ 7-8. Thus, *Hennessy* is neither controlling nor persuasive.

{55} We acknowledge that the State's decision to impeach Defendant with that particular statement was very near the line that had been drawn by the district court. The better practice would have been to ask to approach the bench to confirm that the question was permissible in light of the court's ruling to exclude evidence that the warrant was for murder. But under the circumstances, the State's questioning was sufficiently distinct from the substance of the court's ruling that we will not second-

guess the lack of a reaction from the court or from defense counsel. Indeed, defense counsel could have reasonably concluded that objecting to the State's questioning may have merely highlighted the prejudice such that the better course of action was to remain silent. *See, e.g.*, *Anderson v. Sternes*, 243 F.3d 1049, 1057-58 (7th Cir. 2001) (noting that a counsel's strategy of avoiding emphasis of prejudicial evidence may reasonably encompass the eschewing of limiting instructions). Moreover, we will assume that the court permitted the State's questioning under its broad discretion to control the examination of witnesses and the overall fairness of the presentation of evidence. *See, e.g.*, *State v. Jett*, 1991-NMSC-011, ¶ 13, 111 N.M. 309, 805 P.2d 78 ("A trial court's ruling as to the permissible scope of cross-examination is also reviewed under the abuse of discretion standard." (internal quotation marks and citation omitted)).

**IV.   Substantial Evidence to Show Deliberation**

{56}     Defendant argues that his first-degree murder conviction must be reversed because the State failed to prove the essential element of deliberation. *See* NMSA 1978, § 30-2-1(A)(1) (1994) ("Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused . . . by any kind of willful, deliberate and premeditated

killing . . . ."); *see also* UJI 14-201 NMRA (providing that willful and deliberate murder requires proof beyond a reasonable doubt that "[t]he killing was [done] with the deliberate intention to take away the life of [the victim]").

{57}     When reviewing for substantial evidence, we ask "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314. We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the defendant's] version of the facts." *Id.* (internal quotation marks and citations omitted). Instead, we ask whether a "rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Id.* (internal quotation marks and citation omitted).

{58}     To support a conviction for first-degree murder by deliberate killing, the State must prove beyond a reasonable doubt that Defendant killed Deputy McGrane with the deliberate intention of taking away his life. UJI 14-201.

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his [or her] reasons for and against such a choice.

*Id*.

{59} Defendant contends that the evidence introduced and relied upon by the State to prove deliberation was insufficient to prove that the homicide was "more than an impulsive killing." *See State v. Garcia*, 1992-NMSC-048, ¶ 22, 114 N.M. 269, 837 P.2d 862. He argues that although the State introduced substantial evidence that the shooting occurred during a traffic stop, the record is "silent regarding how the shooting took place." Without an eye-witness account to describe the details of the shooting, Defendant contends, the State's evidence was "equally consistent with an impulsive, panicked reaction to being pulled over by the police as it is [with] a deliberate-intent murder."

{60} A deliberate intention is rarely subject to proof by direct evidence and often must be inferred from the circumstances. *See Duran*, 2006-NMSC-035, ¶ 7 ("Intent is subjective and is almost always inferred from other facts in the case, as it is rarely

41

established by direct evidence." (internal quotation marks and citations omitted)); *see also* UJI 14-201 ("A deliberate intention may be inferred from all of the facts and circumstances of the killing."). The State contends that it introduced "ample evidence" at trial to allow the jury to infer Defendant's deliberate intention to kill Deputy McGrane. In particular, the State maintains that the circumstances of the shooting itself support an inference of a deliberate intention. The jury reasonably could have concluded that Defendant complied when Deputy McGrane pulled him over, retrieved his gun while he waited for Deputy McGrane to approach the truck on foot, and when Deputy McGrane neared the window, shot twice at Deputy McGrane from point-blank range.

{61} Defendant compares these facts to those in *Garcia* and contends that the evidence relied on by the State shows merely that Defendant had an *opportunity* to deliberate, not that he actually deliberated. *See* 1992-NMSC-048, ¶ 28. In *Garcia*, this Court found insufficient evidence of a deliberate intention when the evidence showed that the defendant and the victim argued, appeared to reconcile, and argued again, ending with the defendant stabbing the victim to death. *Id*. The Court reasoned that, even though the defendant had time between the arguments to form a deliberate intention, "nothing in the evidence enabled the jury to infer that this is when he

42

formed the requisite deliberate intent, or that he *ever* formed such an intent." *Id.* ¶ 30.

{62} *Garcia* represents the high-water mark of what this Court has required on appeal to show substantial evidence of a deliberate intention. *See Flores*, 2010-NMSC-002, ¶ 21 ("The facts in *Garcia* have been distinguished many times by this Court from the facts in cases where there was sufficient evidence of deliberation."). We take this opportunity to emphasize that the factual basis for our holding in *Garcia* was narrow. Despite abundant evidence that the killing in *Garcia* was intentional, our concern was that the State had utterly failed to introduce evidence that the killing was anything other than "rash and impulsive":

> [W]e believe that the evidence was not only insufficient to allow a rational jury to find the essential element of deliberation in [the defendant's] stabbing of [the victim]; it was *altogether lacking* to serve as a basis for any such inference. There was *no* evidence to support the jury's conclusion that, as contemplated by the trial court's instruction, [the defendant] decided to stab [the victim] as a result of careful thought; that he weighed the considerations for and against his proposed course of action; and that he weighed and considered the question of killing and his reasons for and against this choice.

*Garcia*, 1992-NMSC-048, ¶ 28 (first emphasis added).

{63} The circumstances of this case are far removed from those of *Garcia*. Rather than proving only "a rash and impulsive killing," *Garcia*, 1992-NMSC-048, ¶ 28, the evidence in this case supported an inference beyond a reasonable doubt that

43

Defendant "weigh[ed] and consider[ed] the question of killing and his reasons for and against such a choice." UJI 14-201. We agree with the State that the manner of the killing alone supported an inference of deliberation. The jury could have reasonably inferred that, once Defendant saw that he was being pulled over, he faced several options, including whether: (1) to cooperate with Deputy McGrane during the stop and likely be arrested on the outstanding warrant; (2) to attempt to flee from Deputy McGrane; or (3) the option that he chose—to wait for Deputy McGrane to approach the truck and shoot him in the face at point-blank range. The jury could have found that Defendant contemplated all of these choices and, even if he did not make his final decision until the last second, the decision to kill Deputy McGrane was nonetheless a deliberate one. *See State v. Sosa*, 2000-NMSC-036, ¶ 14, 129 N.M. 767, 14 P.3d 32 ("Based upon the evidence, a reasonable jury could determine that [the] [d]efendant intended to kill [the victim] when he went to [the victim's] home armed with a gun, waited for him to arrive, and then shot the unarmed victim numerous times."); *see also* UJI 14-201 ("A calculated judgment and decision may be arrived at in a short period of time."); *cf. People v. Mendoza*, 263 P.3d 1, 13-15 (Cal. 2011) (finding substantial evidence of "premeditated and deliberate murder" when the defendant obeyed an officer's command to sit on a curb, hid behind another

person to conceal drawing his gun, and shot the officer in the face).

{64} We also agree with the State that other evidence introduced at trial supported finding a deliberate intention to take away the life of Deputy McGrane. The jury could have inferred that Defendant had a motive for the shooting, which may be probative of a deliberate intention. *See, e.g.*, *State v. Motes*, 1994-NMSC-115, ¶¶ 14-15, 118 N.M. 727, 885 P.2d 648 (relying in part on evidence of the defendant's motive to find a deliberate intention to kill his ex-wife). The jury could have found that Defendant killed Deputy McGrane to avoid arrest because Defendant knew that he was wanted on an outstanding arrest warrant and had organized his life to hide his identity by driving a truck registered in someone else's name, purchasing a mobile home under an alias in the isolated East Mountains, and making himself known under that alias. *Cf. Mendoza*, 263 P.3d at 14-15 (finding evidence of a "preexisting motive" when the defendant was on parole and knew that he would be arrested and sent back to prison if the victim-officer found that the defendant was in possession of a firearm).

{65} The jury also could have found that Defendant's actions after the killing aided in proving a deliberate intention. Shortly after the shooting, Defendant told his friend, "[The Sheriff's Office] fucked it up again, and I started to do good again, and they

45

fucked it up." Moreover, Defendant fled to Mexico after the shooting, where he informed a new acquaintance, "I'm Michael Astorga, I blasted that cop." While these statements, standing alone, might have been insufficient to prove Defendant's deliberate intention, they were probative of deliberation in the context of all of the evidence introduced on that element of first-degree murder. *See Duran*, 2006-NMSC-035, ¶ 9 (finding evidence of a deliberate intention based in part on the defendant's statement after the killing that he had "straight up murdered some bitch"); *see also Flores*, 2010-NMSC-002, ¶ 23 ("Not only may [the] [d]efendant's acts before and during the crime provide evidence of intent, evidence of flight or 'an attempt to deceive the police' may prove consciousness of guilt." (quoting *State v. Martinez*, 1999-NMSC-018, ¶¶ 29-30, 127 N.M. 207, 979 P.2d 718)); *Rojo*, 1999-NMSC-001, ¶ 23 ("[J]ust because each component may be insufficient to support the conviction when viewed alone does not mean the evidence cannot combine to form substantial, or even overwhelming, support for the conviction when viewed as a whole."); *cf. Mendoza*, 263 P.3d at 14-15, 18 (affirming the defendant's conviction based on substantial evidence of "planning activity, preexisting motive, and manner of killing").

{66}     In sum, the circumstances of this case are nowhere near the circumstances of

46

*Garcia*. The State introduced abundant evidence of Defendant's deliberate intention to take away the life of Deputy McGrane.

**V.    Change of Venue**

{67}    For his last argument, Defendant claims that the district court abused its discretion when it denied his motion for a change of venue before the guilt phase of his trial. Defendant filed a pretrial motion for change of venue, claiming the jury pool in Bernalillo County would be prejudiced against him due to extensive media coverage of the case. After an evidentiary hearing on the motion, the district court denied Defendant's request, citing a lack of evidence that the entire jury pool was presumptively prejudiced. After the guilt phase, however, the district court granted Defendant's renewed motion for a change of venue, reasoning that the guilt-phase trial had generated "a lot of public excitement" and that the court had received a low number of responses to the juror questionnaires sent out to potential members of the penalty-phase jury pool. Defendant contends that the district court's decision to change the venue for the penalty phase shows that the court abused its discretion when it denied Defendant's motion before the guilt phase. We disagree.

{68}    We review the denial of a motion for change of venue for an abuse of discretion. *State v. House*, 1999-NMSC-014, ¶ 31, 127 N.M. 151, 978 P.2d 967. The

47

trial court may change venue based on presumed prejudice or on actual prejudice. *Id.* ¶ 45-47. Presumed prejudice arises when "evidence shows that the community is so saturated with inflammatory publicity about the crime that it must be presumed that the trial proceedings are tainted." *Id.* ¶ 46. However, if the court concludes that presumed prejudice is not present and instead proceeds to voir dire, "we will limit our review to the evidence of actual prejudice." *State v. Barrera*, 2001-NMSC-014, ¶ 16, 130 N.M. 227, 22 P.3d 1177. "Actual prejudice requires a direct investigation into the attitudes of potential jurors [during voir dire] . . . to establish whether there is such widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible." *House*, 1999-NMSC-014, ¶ 46. A finding of no actual prejudice must be supported by substantial evidence and "necessarily precludes a finding of presumed prejudice." *See Barrera*, 2001-NMSC-014, ¶ 16.

{69} In this case, the district court found insufficient evidence of presumed prejudice and proceeded to voir dire. Potential jurors filled out extensive questionnaires, and over the course of the voir dire, each potential juror was questioned regarding actual prejudice. Jurors who could not be impartial were excused, and the jury that was finally impaneled was composed of jurors who affirmed their ability to remain impartial.

{70} Defendant does not offer, and we are unable to find, any evidence in the record of actual prejudice against Defendant held by the members of the guilt-phase jury panel. We also note that Defendant did not renew his motion for a change of venue after voir dire, tacitly agreeing that there was no evidence of actual prejudice among the members of the guilt-phase jury panel. This procedure was adequate to safeguard Defendant's right to a fair and impartial jury. *See Barrera*, 2001-NMSC-014, ¶ 18 (noting that the trial court determined "through voir dire that the jurors, although they may have heard of the case, were not incapable of impartiality" and that "[m]ore is not required" (quoting *State v. Chamberlain*, 1991-NMSC-094, ¶ 6, 112 N.M. 723, 819 P.2d 673)); *see also State v. Lasner*, 2000-NMSC-038, ¶ 27, 129 N.M. 806, 14 P.3d 1282 (holding that the trial court did not abuse discretion in denying change of venue where the defendant was able to question jurors and challenge those who indicated partiality).

{71} The district court's decision to grant the renewed motion for a change of venue—after the highly publicized guilt-phase trial—does not lead us to a different result. Rather, we view the district court's grant of the renewed motion as indicative of its ability to maintain a fair and open mind throughout the complicated and lengthy proceedings of this case. The district court did not abuse its discretion when it denied

Defendant's motion for a change of venue.

**CONCLUSION**

{72}     We affirm all of Defendant's convictions.

{73}     **IT IS SO ORDERED.**


_____
                                        **EDWARD L. CHÁVEZ, Justice**


**WE CONCUR:**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**CHARLES W. DANIELS, Justice**